**In re ERNST HOME CENTER, INC. and EDC, Inc., Debtors.**

**Bankruptcy No. 96–10129.**

United States Bankruptcy Court, W.D. Washington.

June 16, 1997.

Timothy W. Dore, Seattle, WA,

Dillon E. Jackson, Seattle, WA,

Alan D. Smith, Seattle, WA,

KAREN A. OVERSTREET, Bankruptcy Judge.

## MEMORANDUM DECISION

This Memorandum Decision constitutes the Court's decision on two motions filed by the debtor, Ernst Home Center, Inc. ("Ernst"): (i) Ernst's Motion For Order (1) Approving FADCO Agreement, (2) Authorizing the Sale and Other Disposition of Certain Leasehold and Fee Interests, and (3) Granting Related Relief (the "FADCO Motion"), and (ii) Ernst's Motion to Extend Time Within Which to Assume or Reject Certain Unexpired Nonresidential Real Property Leases (the "Extension Motion"). This Memorandum Decision restates and supplements the Court's extensive oral ruling made on the record March 5, 1997. For the reasons stated in the Court's oral ruling and as further set forth below, the Court grants both motions.[1]

1. This Memorandum Decision, together with the Court's oral ruling on March 5, 1997, constitutes

## I. FACTS

Ernst was one of the leading home improvement, hardware and garden retailers in the northwestern United States. It filed a voluntary petition under Chapter 11 of the Bankruptcy Code[2] on July 12, 1996 (the "Petition Date"). At the outset of the case, Ernst had over 80 retail store locations in nine different Western states and it employed over 4,000 full and part-time employees. In connection with the bankruptcy filing, Ernst closed 25 of its retail stores, and conducted going-out-of-business sales at eleven of those stores. Subsequently, pursuant to orders of the Court, Ernst began to close additional stores in order to concentrate its efforts in its more profitable locations.

In conjunction with the various going-out-of-business sales, Ernst attempted to significantly pare down its expenses by implementing substantial cost-cutting measures at both the general corporate and retail store levels. Notwithstanding these efforts, and in spite of the cash generated by its going-out-of-business sales, Ernst continued to suffer significant operating losses, resulting in a deterioration in value of the estate. Sales were inadequate to stem ongoing operating losses, much less sufficient to generate a profit. As a result, in November of 1996, Ernst's management determined that a reorganization of Ernst's business was simply not feasible and that an orderly liquidation or other disposition of its business would yield maximum value for Ernst's estate and creditors.

### A. Approval of AOS as Ernst's Consultant.

On September 25, 1996, the Court entered an order authorizing the sale of six store locations to AOS Investments LLC ("AOS") and the management by AOS of an additional eighteen store locations pursuant to an agreement between AOS and Ernst (the "AOS Agreement"). The AOS Agreement contemplates that AOS will market the leases described therein (collectively, the "AOS Leases") to third parties.[3] When Ernst's liquidation plan was approved in November 1996, the Court also approved Ernst's retention of AOS to act as its liquidation consultant. Under the terms of the consulting agreement between Ernst and AOS (the "Consulting Agreement"), AOS was responsible for assisting Ernst with the going-out-of-business sales at Ernst's remaining retail stores and for marketing Ernst's real property leases. The Court set March 25, 1997 as the deadline under Section 365(d)(4) for Ernst to assume or reject all of its leases.

The culmination of the marketing efforts of AOS and Ernst with respect to the non-AOS Leases is the proposed transaction with FADCO LLC ("FADCO") for which Ernst seeks the Court's approval (the "FADCO Transaction").

### B. The FADCO Transaction.

Ernst seeks this Court's approval to enter into an agreement with FADCO (the "FADCO Agreement"), pursuant to which Ernst will sell to FADCO three fee interests in real property and 59 leasehold interests (the "FADCO Leases"). During the term of the FADCO Agreement, FADCO will have the right to direct Ernst to assume and assign the FADCO Leases to a designee of FADCO or to reject any of the leases. Ernst, however, is not seeking as part of the FADCO Motion to immediately assume and assign the FADCO Leases to FADCO under Section 365. Instead, Ernst requests that it be given a 14–month extension under Section 365(d)(4) to satisfy a condition of the FADCO Agreement that gives FADCO fourteen months during which *FADCO* may direct *Ernst* to assume or reject the FADCO Leases. During this 14–month period, FADCO must pay all of the ongoing occupancy costs of the leases until the leases are assumed or rejected. Ernst estimates these costs to be in excess of $1.6 million per month. Upon

---

the Court's findings of fact and conclusions of law under Bankruptcy Rule 7052.

**2.** Unless otherwise indicated, all Chapter, Section and Rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* and to the Federal Rules of Bankruptcy Procedure, Rules 1001 *et seq.*

**3.** The AOS Leases are not part of the transaction described in the FADCO Motion nor is Ernst seeking an extension of the time to assume or reject those leases by way of the Extension Motion.

assumption of any FADCO Lease, Ernst will be responsible for paying any amounts due under Section 365(b)(1). Any assumption and assignment of a FADCO Lease to FADCO or its designee will be subject to all the requirements of Section 365 and FADCO will be entitled to retain any and all consideration received from its designee in connection with the assignment.

The purchase price to be paid by FADCO for the fee interests and the FADCO Leases is $16 million, subject to a downward adjustment of not more than $4 million, to the extent that any FADCO Lease becomes an "excluded lease" as defined in the FADCO Agreement. FADCO will pay $10 million in cash at closing and the remaining $6 million in six consecutive monthly installments, together with eight percent interest per annum. The deferred purchase price and one month of recurring carrying costs will be secured by an irrevocable letter of credit. FADCO has paid a deposit of $1.6 million. If the FADCO Agreement is terminated pursuant to its terms, Ernst will reacquire all right, title and interest in the FADCO Leases (other than those that have already been rejected or assigned). The purchase price to be paid by FADCO is fixed regardless of whether any of the FADCO Leases are assumed and assigned. Therefore, FADCO faces the risk that if it is not successful in locating end-use tenants that pass muster under Section 365, it will not recover the purchase price paid under the FADCO Agreement.

FADCO is a limited liability company whose members include Alamo Group II, LLC ("Alamo") and FADCO Northwest Investors, LLC, an affiliate of Farallon Capital Management, LLC. ("Farallon"). Alamo is an affiliate of AOS. Farallon is a real estate investment company with substantial funds available for investment in the FADCO Leases, in particular, for funding tenant improvements for FADCO's designees where the landlord does not have the ability or the desire to fund those improvements.

In connection with the FADCO Agreement, AOS represents that it has fully advised Ernst of all negotiations with prospective purchasers and tenants and fully performed its obligations under the Consulting Agreement. Ernst estimates that the fee payable to AOS pursuant to the terms of the Consulting Agreement, in the event that closing occurs under the FADCO Agreement, is approximately $1.5 million.

The FADCO Motion and notice of that motion advised parties in interest that the FADCO Transaction was subject to higher and better offers. In addition, there was a $1 million breakup fee included as part of the transaction. At the hearing on the FADCO Motion, however, there were no competing bidders.

The landlords under the FADCO Leases (the "FADCO Landlords") are the only parties who have filed objections to the FADCO Motion and the Extension Motion. The official unsecured creditors committee (the "Committee") fully supports Ernst's decision to enter into the FADCO Agreement and to obtain an extension of the Section 365(d)(4) deadline.

## C. The Evidence.

Ernst and the FADCO Landlords presented evidence by way of written declarations and the testimony of various witnesses at an evidentiary hearing. Ernst presented evidence demonstrating that the FADCO Leases, if sold separately, would not generate more dollars for the estate than the purchase price to be paid by FADCO. Witnesses for Ernst and AOS detailed the efforts of AOS in marketing the leases in advance of executing the FADCO Agreement. Buyers for individual leases were sought, as were buyers for blocks of leases.

Farallon was one of three firms AOS approached for the purpose of negotiating a global purchase of Ernst's leases. Ernst presented testimony concerning the negotiations between Ernst and AOS and Farallon. In connection with those negotiations, Ernst and AOS presented uncontroverted testimony that it was Farallon, which does not have real estate marketing or lease management capabilities, that insisted that Alamo have an ongoing interest in the marketing and management of the FADCO Leases as a condition of the transaction. This condition was fully disclosed to Ernst and the Committee. Because of Alamo's interest in the FADCO

Transaction, and the potential for a conflict on AOS' part, Ernst insisted that the purchase price under the proposed agreement had to be the amount that Ernst had determined was the full value of the FADCO Leases. Ernst's outside financial advisors took an active role in the negotiations to assure adequate representation of the estate's interests.

The accountant for the Committee submitted a declaration in support of the FADCO Transaction. He testified that the potential conflicts of interest between AOS and FADCO were outweighed by the certainty and value provided by the transaction to the estate. His conclusion was that the purchase price, combined with the elimination of the lease carrying costs and further potential value erosion due to lease expiration dates, provided adequate value to the estate for the portfolio of leases.

The FADCO Landlords attempted to show by way of testimony that FADCO had not been diligent in its marketing efforts, in that it had focused solely on trying to strong arm the landlords into buying out their leases by paying a termination fee to the estate. The Court finds, however, that there is no evidence that this was the focus of AOS' marketing efforts. The landlords also presented testimony concerning the harm that the landlords will suffer if the Ernst stores continue to remain dark during the 14-month extension period, notwithstanding the payment of ongoing carrying costs to the landlords. The FADCO Landlords submitted evidence of both the general harm suffered by landlords when an anchor store like Ernst remains dark for an extended period and the specific harm that some of the landlords will suffer as a result of the cessation of Ernst's business. This evidence is discussed in more detail below.[4] Finally, the landlords tried to demonstrate that AOS had a conflict in negotiating the FADCO Transaction. The landlords presented no evidence, however, that the existence of the potential conflict resulted in any detriment to the estate.

## II. JURISDICTION

This Court has jurisdiction of these proceedings pursuant to 28 U.S.C. § 1334 and this is a core proceeding under 28 U.S.C. § 157.

## III. DISCUSSION

### A. Approval of the FADCO Transaction.

Under Section 363(b)(1), Ernst may use, sell, or lease, other than in the ordinary course of its business, property of the estate. Ernst's decision to enter into the FADCO Transaction, which is outside of the normal course of its business, must be based on its reasonable business judgment. *In re Continental Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir.1986). The Court may approve the FADCO Transaction if Ernst has established "some articulated business justification" for the transaction. *In re Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir.1983); *In re Walter*, 83 B.R. 14 (9th Cir. BAP 1988).

Ernst has shown that it will obtain a minimum of $12 million for the estate in consideration for the transfer of its fee and leasehold interests under the FADCO Agreement. Ernst presented ample evidence to establish that this is a fair value for Ernst's interest in the real property and FADCO Leases that are the subject of the FADCO Agreement. The FADCO Motion provided that the transaction was made subject to higher and better offers, which could be made at the hearing. There was adequate notice of the opportunity to bid on the fee properties and the FADCO Leases, but no other offers were made at or prior to the hearing.

A critical element of the FADCO Transaction is that Ernst will relieve itself of the obligation to continue paying the carrying costs under the FADCO Leases after the transaction closes. This is a significant obligation, which exceeds $1.6 million on a monthly basis for all of the FADCO Leases. Ernst has only a very limited ability to fund these carrying costs in the absence of the FADCO Transaction. The only significant unsecured assets in the estate are the FAD-

---

4. In its oral ruling, the Court discussed the evidence in connection with each separate FADCO Lease. That discussion will not be repeated here.

CO Leases themselves, therefore Ernst must realize immediate value for some of those leases or it will soon be unable to pay the carrying costs of the leases. Without sufficient funds to pay the carrying costs of the leases, Ernst will be forced to reject the leases, thereby forfeiting any value in those assets.

The FADCO Landlords argue that given the substantial attorneys fees in the estate, the FADCO Transaction cannot be expected to generate much of a distribution to unsecured creditors. It is too early in the case to adequately predict what dividend will ultimately be paid to unsecured creditors. In absolute dollars, the FADCO Transaction represents a very significant sum of money for the estate. The opportunity should not be rejected, even if it will produce in the end only a small distribution to unsecured creditors.

The Court concludes that Ernst's decision to enter into the FADCO Transaction is a sound and justified business decision. The FADCO Leases represent the only source for a potential distribution to unsecured creditors in this case. Ernst's receipt of at least $12 million under the FADCO Agreement, therefore, is of significant benefit to the estate.

**B. Ernst's Request for an Extension of Time Under Section 365(b)(4).**

██ A finding that the FADCO Transaction is in the best interests of the estate, however, does not end the inquiry. FADCO's obligations under the FADCO Agreement are expressly conditioned on Ernst obtaining from the Court a 14–month extension, beyond March 25, 1997, of the time to assume or reject the FADCO Leases under Section 365(d)(4). Therefore, the Court must determine whether Ernst is entitled to such an extension.[5]

Section 365(d)(4) permits the Court to extend Ernst's time to assume or reject a lease of nonresidential real property "for cause." Although "cause" is not defined in Section 365(d)(4), courts generally look to the following factors for guidance:

1. Whether the lease is the primary asset of the debtor.

2. Whether the lessor has a reversionary interest in the building built by the debtor on the landlord's land.

3. Whether the debtor has had time to intelligently appraise its financial situation and potential value of its assets in terms of the formulation of a plan.

4. Whether the lessor continues to receive the rent required in the lease.

5. Whether the lessor will be damaged beyond the compensation available under the Bankruptcy Code due to the debtor's continued occupation.

6. Whether the case is exceptionally complex and involves a large number of leases.

7. Whether the need exists for a judicial determination of whether the lease is a disguised security interest.

8. Whether the debtor has failed or is unable to formulate a plan when it has had more than enough time to do so.

9. Any other factors bearing on whether the debtor has had a reasonable amount of time to decide to assume or reject the lease.

*See, e.g., Theatre Holding Corp. v. Mauro,* 681 F.2d 102 (2d Cir.1982); *In re Victoria Station, Inc.,* 88 B.R. 231, 236 (9th Cir. BAP 1988), *aff'd,* 875 F.2d 1380 (9th Cir.1989); *In re Wedtech Corporation,* 72 B.R. 464, 471–473 (Bankr.S.D.N.Y.1987).

██ In the *Victoria Station* case, the Bankruptcy Appellate Panel noted that there are "numerous and important factors" that should be considered when reviewing a request for an extension of time under Section 365(d)(4), including those factors set forth above. Certainly, the list of enumerated factors was not meant to be exclusive nor should a Court be required to consider particular factors that have no application to the re-

---

5. The Court agrees with the reasoning in *Escondido Mission Village, L.P. v. Best Products Co.,* 137 B.R. 114 (S.D.N.Y.1992), that when a number of landlords object to a debtor's request for an extension under Section 365(d)(4), the Court must consider the particular concerns of each landlord. The Court addressed each of the objecting landlords' concerns in its oral opinion.

quest for extension at issue.[6] The test for "cause" under Section 365(d)(4) leaves a great deal of discretion to the Court to weigh all relevant factors related to a requested extension. The FADCO Transaction is unique and a matter of first impression for this Court. Thus the Extension Motion cannot be properly analyzed by a rigid application of the factors set forth above. The Court concludes that Ernst has demonstrated cause for the requested extension.

The FADCO Landlords argue that the Court must look at each FADCO Lease individually and conclude that each lease, standing alone, is not "the" primary asset of Ernst. This argument is without merit. The Appellate Panel in *Victoria Station* referred to whether the leases are "the" primary assets of the debtor when restating in a footnote the various factors considered by the courts. 88 B.R. at 236, n. 7. The cases cited in that footnote, however, do not hold that the lease must be the primary asset of the debtor. In *In re Wedtech Corporation, supra,* the court held that the lease at issue there was "a principal asset" of the debtor. 72 B.R. at 472. In *Theatre Holding Corp., supra,* the debtor had only one real property lease, so the court never considered the distinction advanced by the FADCO Landlords.

In any Chapter 11 case involving a retail debtor like Ernst, no one lease will likely ever be considered the primary asset of the debtor, just as no one piece of equipment or inventory would be considered the primary asset of the debtor. Each of the FADCO Leases is clearly a principal asset of the debtor, however, and together the FADCO Leases are *the* primary assets of Ernst, as far as unsecured creditors are concerned. The $12 million guaranteed purchase price to be paid by FADCO is proof of the importance and value of these assets.

The FADCO Landlords next argue that because Ernst is liquidating rather than reorganizing, Ernst is not entitled to additional time to evaluate the leases for purposes of a plan. The landlords argue that the Court cannot even consider maximization of the estate as a factor in determining cause

for an extension. No distinction is made in Section 365, however, between a liquidating and reorganizing debtor. That Ernst is liquidating does not make it any less critical that it have an adequate opportunity to maximize the value of its leasehold interests for its creditors. It is easy to see why in a case involving a reorganization, like *Victoria Station* and *Wedtech,* the courts would look at the importance of the debtor's leases to the reorganization process. Where liquidation is the only alternative for a debtor like Ernst, however, the Court should determine whether the extension will result in a benefit to the estate that outweighs the detriment to the landlords affected by the extension. As discussed below, the Court concludes that the benefit to the estate of the FADCO Transaction outweighs any detriment to the FADCO Landlords caused by the proposed 14-month extension.

This case differs markedly from other reported cases in that Ernst is not asking for an extension because it has not had sufficient time to figure out what to do with the FADCO Leases. That decision—to sell them to FADCO—has been made. Instead, the requested extension is for the sole purpose of giving FADCO sufficient time to find end-use tenants for the leased properties so that FADCO can get the benefit of its bargain. Ernst will receive at least $12 million, even if none of the FADCO Leases is ever assigned. It is not surprising that the extension is a condition to FADCO's obligation to pay the purchase price.

The parties all agree, and the evidence confirms, that the FADCO Leases will be difficult to market. The physical space leased by Ernst at most of the leased locations is too large for most prospective tenants, and smaller tenants will require significant tenant improvements to divide the space. The large number of leases makes them difficult to market. The FADCO Landlords argue that they could more successfully market the leases because they would be responsible only for their own lease. FADCO argues that its ability to

---

That analysis, though not fully restated here, is incorporated herein by reference.

**6.** The second and seventh of the enumerated factors have no application to this case and will therefore not be discussed.

market the leases is greater than the landlords' because it can package groups of leases for sale to larger retailers looking for multiple sites, and because it has substantial funds available to finance tenant improvements (when the landlord does not want to fund the tenant improvements). Whether FADCO or the individual FADCO Landlords can better market the leases is not really relevant to the Court's inquiry. The paramount issue is whether the benefit to the estate from the FADCO Transaction justifies the 14–month extension in light of any harm that will be suffered by the FADCO Landlords during that period. Thus, the Court must consider the harm to the landlords.

During the term of the 14–month extension, FADCO is required to pay all of the carrying costs of the FADCO Leases, including base rent, taxes, insurance, and CAM charges. Because Ernst is no longer operating at any of the locations, the landlords argue that they will lose the percentage rents under the leases. These amounts, however, are relatively minor compared to the amount of the carrying costs that FADCO will be paying. In the case of most of the FADCO Landlords, they will lose more money if their leases are rejected and they lose one month's base rent than they will if they lose 14–month's worth of percentage rent during the extension period. Therefore, the landlords' argument—that the loss of percentage rent is significant enough to warrant denial of the requested extension—is without merit.

The real concern of the FADCO Landlords, and of the Court, is the harm to landlords resulting from having a major anchor tenant stop operating for an extended period. Ernst ceased operations at the FADCO Lease locations in January, 1997. The stores have been and will continue to be dark until new tenants are found. The impact of dark anchor stores in shopping centers is well documented and was part of the evidence presented by the FADCO Landlords at the hearing. Vacant anchor stores typically cause a drop in overall customer traffic at the center and reduced sales for other nonanchor tenants, and detrimentally affect the ability of the owner of the center to sell the center or refinance any mortgages against the cen-

ter. In addition, it may become more difficult for the landlord to get other tenants to renew their leases or to negotiate higher rents from other tenants if there is an opportunity to do that. Vandalism may increase, resulting in increased insurance costs.

None of the FADCO Landlords presented evidence of any specific harm to them that would occur if the 14–month extension is approved (other than the loss of percentage rent). They rely solely on the general harms cited above. In evaluating these general harms, the Court must look at whether the landlords will suffer any additional harm than they would suffer under similar circumstances outside the context of a Chapter 11 and whether they will be damaged beyond the compensation available to them under the Bankruptcy Code.

It cannot be disputed that Section 365(d)(4) was enacted for the purpose of protecting landlords in Chapter 11 proceedings. There is no indication in the statute or legislative history, however, that the intent of that section was to give landlords more rights than they would have under state law where a tenant ceases business operations, but continues to pay all carrying costs going forward while it tries to locate a suitable replacement tenant. None of the FADCO Landlords has demonstrated a right to terminate Ernst's lease or oust Ernst from possession because Ernst has ceased operations. Some of the FADCO Leases may have continuous operation clauses. The Court will give those landlords the opportunity to show that the terms of their leases would, under state law, give them the right to remove Ernst from possession, notwithstanding Ernst's continued payment of all monetary amounts due under the lease.[7] Also, at least one of the FADCO Landlords, the landlord of the Shadle Shopping Center in Spokane, Washington, has demonstrated circumstances justifying further review as to whether the 14–month extension imposes too great a hardship on it. The Shadle Center landlord presented evidence that three of its five anchor tenants are currently in bankruptcy and three of the five anchor tenants are dark. The lease also

---

7. These leases include the Shadle Shopping Center lease (Store 227), the Westwood lease (Store 212), the West Bountiful lease (Store 290), and the James Village lease (Store 279).

contains what appears to be a continuous use clause. Therefore, the Court will give this landlord the opportunity to show, in a separate proceeding, that Ernst's extension of time under Section 365(d)(4) should be less than fourteen months.

Most of the FADCO Leases do not have continuous use clauses. Each of the leases was the product of negotiation between sophisticated parties. If a landlord had wanted the protection of continuous operation of the Ernst store in its center, it could have required an appropriate lease provision. The FADCO Landlords urge the Court to find an implied continuous use clause in each of the FADCO Leases.[8] Where the parties are sophisticated and the lease terms are unambiguous, the Court will not imply a term as substantial as a continuous use clause. If Ernst's requested extension is denied, the FADCO Leases will be automatically rejected. This will have the effect of denying Ernst any further rights under those leases. It was not the intent of Section 365(d)(4) to require that result where that would not be the result under state law in similar circumstances.

There is no evidence that the FADCO Landlords will be damaged beyond the compensation available to them under the Bankruptcy Code. Section 365(d)(3) requires Ernst to pay all of the carrying costs of the FADCO Leases during the extension period. Under the terms of the FADCO Transaction, FADCO will pay all of these costs. If any landlord believes it is not receiving all carrying costs, it may petition the Court for relief. If a landlord is entitled to additional costs under the terms of its lease because the Ernst store is vacant, like increased insurance or security costs, it may petition the Court to require that those amounts be paid. If a FADCO Lease is ultimately assumed, the landlord will be entitled to all of the relief afforded by Section 365(b), including the payment of any unpaid amounts due under the lease prior to the Petition Date and any pecuniary losses suffered postpetition. Under the FADCO Transaction, Ernst will be required to pay these amounts. Those landlords whose leases are ultimately rejected will have the right to assert an unsecured claim for damages against the estate and will share in the funds paid by FADCO.[9]

Ernst has not asked for an extension based on a *hope* that it may some day realize some value for the FADCO Leases. Ernst has negotiated a transaction that will provide benefit to the estate immediately. The Court is satisfied that FADCO can meet its obligations with respect to carrying costs, thus there is no risk to landlords that they will not be paid. Moreover, FADCO has a built-in incentive to expedite its marketing efforts: if the value of any lease to FADCO is not sufficient to justify the ongoing payment of the carrying costs of the lease, FADCO will want to reject the lease to avoid further payment of carrying costs. The longer the space is vacant, the less FADCO can expect to net in any future sale of the lease.

In enacting Section 365(d)(3), Congress considered not only the circumstance in Chapter 11 in which a debtor would continue to conduct its business in leased space, but also the circumstance in which a debtor's leased property would be vacant for a period postpetition. The legislative history reveals that Congress' paramount concern was that the landlord be paid for the debtor's use of the property during the Chapter 11. The legislative history to Section 365(d)(3) makes it clear that the section was intended to assure that landlords receive current pay-

---

**8.** The FADCO Landlords cite *Daniels v. Ward,* 35 Wash.App. 697, 669 P.2d 495 (1983), in support of their argument. In that case, the court permitted the landlord to terminate the lease where there did not appear to be a continuous use clause and the tenant continued to pay basic rent. The tenant's subtenant had ceased business and the landlord sued the tenant for unlawful detainer. Without discussion, the court concluded, in part because percentage rent was involved, that the failure to comply with the use provision was a breach of the lease

justifying a finding of unlawful detainer. The court relied on other breaches in entering judgment for the landlord and never considered specifically the issue presented by the FADCO Landlords.

**9.** The Court recognizes that the landlords in this position will be subjected to greater risks than a landlord whose lease is assumed, because it is clear that unsecured creditors will not, under any circumstances, receive the full amount of their claims.

ment under their leases while the debtor determines whether the lease should be assumed or rejected.

> [The second] problem is that **during the time the debtor has vacated space but has not yet decided whether to assume or reject the lease, the trustee has stopped making payments due under the lease.** These payments include rent due the landlord and common area charges which are paid by all tenants according to the amount of space they lease. **In this situation, the landlord is forced to provide current services—the use of its property, utilities, security, and other services—without current payment.** No other creditor is put in this position. . . .
>
> The bill would lessen these problems by requiring the trustee to perform all the obligations of the debtor under a lease of nonresidential real property at the time required in the lease. This timely performance requirement will insure that debtor-tenants pay their rent, common area, and other charges on time pending the trustee's assumption or rejection of the lease.

130 Cong. Rec. § 8894–95 (daily ed. June 29, 1984)(remarks of Senator Hatch) (emphasis added). In this case, the FADCO Landlords will be paid currently what is due under their leases during the extension period, which is what Congress intended.

In the final analysis, the Court is not persuaded that the FADCO Landlords' ultimate concern is that the Ernst stores are dark. This is really a fight about the value of the FADCO Leases. That FADCO is willing to pay at least $12 million for the leases attests to the value of these leases. If Ernst was not able to capture that value for the estate through the FADCO Transaction, that value would revert back to the FADCO Landlords. If the landlords' only concern was to expedite the re-tenanting of their property, they could facilitate that process by cooperating with FADCO in the marketing process and by making appropriate lease concessions (such as in the case of the use clause) so as to enable a new tenant to quickly take over the space.

## C. The Landlords' Right to Shorten the 14–Month Period.

 Under the FADCO Transaction, the landlords (other than the landlords of the four stores identified above) will not have the right to move to shorten the 14–month extension period. The landlords argue that they are entitled to such a right, similar to that which is afforded under Section 365(d)(2). By its terms, however, Section 365(d)(2) applies only to residential real property leases. Section 365(d)(2) requires a landlord to show cause for a reduction of the time for assumption or rejection. By contrast, Section 365(d)(4) puts the burden on the debtor to show cause for an extension. Once cause for an extension is shown under Section 365(d)(4), the statute does not afford a landlord the right to terminate the assumption/rejection period prior to the date set by the court.

*Collier on Bankruptcy* suggests that the exclusion of nonresidential real estate leases from Section 365(d)(2) produces an anomalous result and that the result may be the product of a drafting oversight, which can be remedied by inserting into any extension order a procedure for reconsideration of the order in the event a landlord's circumstances change. *Collier on Bankruptcy*, 365–37 (15th Ed.1996). This is in effect what the bankruptcy court did in the *Victoria Station* case: it allowed the landlord there to seek a reduction in the time period at a later date and it required that status hearings be held every 60 days. *See Victoria Station*, 88 B.R. at 237. The appellate court concluded that "it was clearly within the court's discretion to grant one long extension, rather than requiring the debtor to seek several short extensions." *Id.* In that case, however, unlike this case, the debtor had a mere hope that the lease would someday generate some proceeds for the estate. In those circumstances, it would make sense to limit the extension and look at the circumstances on a periodic basis to be sure that there is still a likelihood of obtaining value for the estate and that the debtor has the continuing ability to pay ongoing carrying costs.

In this case, Ernst has secured value for the estate and all of the parties agree that it

will be difficult, even with the additional fourteen months, to locate end-use tenants for these leases because of the complexity of the space and the requirements of Section 365. The fact that the FADCO Landlords will not have a right to seek a reduction of the 14–month period is but one factor, together with all of the other factors discussed above, that the Court should consider in approving the overall transaction. The 14–month extension is a *quid pro quo* for the substantial purchase price to be paid by FADCO. Loss of any of the FADCO Leases from the transaction will affect the value of the total package to FADCO. Given the unique circumstances of the FADCO Transaction, the Court concludes that it is reasonable to deny the FADCO Landlords the right to seek to terminate the extension prior to the end of the 14–month period.

## D. The Applicability of Section 363(m).

### 1. *Authorization under Section 363(b).*

■ Ernst and FADCO urge the Court to hold that Section 363(m) applies to the FADCO Transaction so that the FADCO Landlords will have to obtain a stay pending any appeal in order to prevent the appeal from being moot. Section 363(m) applies to "an authorization under" Section 363(b) or (c) of a sale or lease of property. Therefore, it is this Court's obligation to determine whether it is appropriate to *authorize* the FADCO Transaction under Section 363(b).

Ernst argues that the FADCO Transaction represents, in effect, a sale of the "bonus value" of the FADCO Leases. No one has really defined "bonus value," but it appears to be that value that may be present in the FADCO Leases because they are long-term leases with rents below the current market value of the leased space. The FADCO Landlords argue that the FADCO Transaction is not a sale, because the so-called "bonus value" of the leases is not a property interest that can be sold and that the proposed transaction is merely an improper attempt by Ernst to assign its right to assume and assign under Section 365 to a third party

without immediately complying with the requirements of Section 365.

Ordinarily, the Court will look to state law to determine whether a particular interest is "property" for purposes of bankruptcy and Section 541. *Butner v. U.S.*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). Not surprisingly, no one has cited any state or federal law directly on point.[10] The rights and interests created under Section 365, in particular the right of the debtor to assume and assign leases that would not otherwise be assignable under state law, are unique to bankruptcy law. The debtor's power under Section 365 to assume and assign a lease creates value for the bankruptcy estate where no value would be present under state law. In *U.S. v. Whiting Pools, Inc.*, 462 U.S. 198, 205, 103 S.Ct. 2309, 2313–14, 76 L.Ed.2d 515 (1983), the Supreme Court held that "§ 541(a)(1) is intended to include in the estate any property made available to the estate by other provisions of the Bankruptcy Code." The Court concludes that the "bonus value" of the FADCO Leases is such an interest and that, as such, it constitutes property for purposes of Section 363(b).

In the most simple analysis, the "bonus value" of a lease is nothing more than an estimate of the value of a lease that will be realized in the form of cash proceeds when the lease is actually assigned. No one would dispute that the lease itself is property and, under Section 541(a)(6), proceeds of property are expressly included in the ambit of property of the estate. Under the FADCO Agreement, the parties have fixed the value of the FADCO Leases as the purchase price to be paid by FADCO, and that value may be realized by FADCO upon Ernst's assumption and assignment of the leases when the proceeds are actually received. Those proceeds constitute property.

Moreover, the FADCO Transaction involves the sale of three fee interests. At least in that sense, the transaction represents a sale of property and must be autho-

---

**10.** In support of its argument, Ernst identifies various intangible rights that have been held to be property by the courts. These include net operating losses, *In re Prudential Lines, Inc.*, 928 F.2d 565 (2d Cir.), *cert. denied* 502 U.S. 821, 112

S.Ct. 82, 116 L.Ed.2d 55 (1991); the equity of redemption after a foreclosure sale, *In re Brown*, 734 F.2d 119 (2d Cir.1984); and contract rights generally, *In re Verco Industries, Inc.*, 704 F.2d 1134 (9th Cir.1983).

986

rized under Section 363(b). This was the case in *In re Exennium, Inc.*, 715 F.2d 1401 (9th Cir.1983), where the court affirmed the bankruptcy court's authorization of a sale involving both real estate leases and personal property under Section 363(b). The court there concluded that Section 363(m) applied. The sale of the fee interests and the FADCO Leases is an integrated transaction. The FADCO Transaction does not, at least at this point, involve an assumption and assignment of any FADCO Lease, therefore the transaction is not one that can be authorized under Section 365.[11] The Court concludes that the transactions contemplated by the FADCO Agreement represent a sale of property by Ernst.

The FADCO Landlords argue that even if Section 363(m) is appropriate in connection with the FADCO Motion, it should not be applicable to the Extension Motion. The Court disagrees. The two motions depend upon each other: Ernst cannot effect the FADCO Transaction unless both motions are approved. In the absence of the FADCO Transaction, there would be no grounds for approval of the Extension Motion. Likewise, without approval of the Extension Motion, the condition of the FADCO Agreement requiring Ernst to obtain a 14–month extension of the time to assume or reject the FADCO Leases could not be met, preventing closing of the transaction.

The intent of Section 363(m) is to encourage third parties to do business with a debtor in possession, by providing certainty and finality to a transaction where consideration is paid in good faith to the estate by that third party. *See, e.g., Algeran, Inc. v. Advance Ross Corp.*, 759 F.2d 1421, 1424 (9th Cir.1985). FADCO is providing substantial consideration to the estate. It will be making a substantial investment in the FADCO Leases after closing through payment of the ongoing carrying costs of the leases. The FADCO Transaction is exactly the kind of transaction that Section 363(m) should protect. Therefore, Section 363(m) should apply to the FADCO Motion and the Extension Motion.

## 2. *Good Faith.*

The FADCO Landlords argue that even if Section 363(m) applies, FADCO cannot be considered a good faith purchaser because (i) FADCO's intent under the FADCO Agreement is really to strong-arm the landlords into paying FADCO to get the leases rejected and free of the bankruptcy proceedings, and (ii) because AOS is acting in its own self-interest as consultant to Ernst in seeking approval of the FADCO Transaction while its affiliate, Alamo is a member of FADCO.

Lack of good faith is generally determined by fraudulent conduct during the sale proceedings. *In re Exennium, Inc.*, 715 F.2d 1401, 1404–05 (9th Cir.1983). The Court finds no evidence of fraudulent conduct on the part of AOS, Alamo, FADCO, or Farallon in connection with the FADCO Transaction.

The FADCO Landlords allege that FADCO's only intent is to force them to buy out the "bonus value" of their leases to get them released from the bankruptcy proceedings by way of lease rejections. They argue that the Court should not sanction such improper motives by approving the FADCO Agreement. First, the landlords presented no evidence that this is in fact the intention of FADCO. FADCO presented credible evidence that it intends to diligently market the FADCO Leases and to obtain where possible end-use tenants that meet the requirements of Section 365. At the point when the carrying costs of a particular lease are not justified in light of the potential "bonus value" to be obtained by assigning the lease, FADCO will have a strong incentive to reject the lease. Thus, it is not in FADCO's financial interest to maintain the FADCO Leases for an extended period of time, at a cost of in excess of $1.6 million per month, just to see if the landlords will spring for some cash. There is no question that to date, Ernst has not been particularly successful in assigning its leases to end-use tenants for consideration. Instead, Ernst has received substantial consideration from landlords who have agreed to buy out their leases in exchange for a rejection and termination of their leases. This,

11. Because Ernst is not seeking to assign the leases to FADCO, it is not necessary for the Court to determine whether Section 363(m) would apply to such an assignment.

however, is nothing more than a recognition by those landlords of the same fact recognized by Ernst and FADCO—these leases have significant value. Landlords who buy out their leases are then free to lease the property, without the restrictions contained in the Ernst lease, at current market rates.[12]

The Court is not persuaded that Alamo's participation in the FADCO entity constitutes a conflict of interest so as to mandate a finding that FADCO, AOS or Alamo has acted in bad faith. There was ample testimony that it was Farallon alone that made Alamo's participation in the deal a condition to going forward. Because of the potential for conflict, Ernst and its consultants required that the purchase price paid by FADCO equal the value of the FADCO Leases as determined by Ernst. The members of the Committee and its consultants reviewed the transaction in detail and found no improprieties. To the contrary, they urge the Court to approve the transaction.

Accordingly, the Court finds that AOS and FADCO and its members have acted in good faith in connection with the proposed transaction.

## CONCLUSION

For the reasons set forth in this Memorandum Decision, and subject to the special provisions for certain FADCO Landlords as discussed above, the Court will approve the FADCO Motion and the Extension Motion.

12. The FADCO Landlords also argue that FADCO's intent is to force them to sell their shopping centers to FADCO at a reduced price because of the presence of the dark Ernst space. FADCO made no secret of its interest in purchasing one or more shopping centers, if an owner was interested in such a sale. There was no evidence, however, of any improper actions of FADCO in this regard and in the case of offers made by FADCO, the shopping center owners rejected those offers. In the case of the Shadle Shopping Center in Spokane, Washington, where three of its five anchor tenants are in bankruptcy and three are dark, perhaps making the owner more susceptible to pressure by FADCO, the Court has permitted the landlord to seek to terminate the 14–month extension in a separate proceeding.