**In re ERNST HOME CENTER, INC., and EDC, Inc., Debtors.**

**BC BRICKYARD ASSOCIATES, LTD., LCF Associates II LLC, Capital Village Associates, Price Development Co., Century Properties Funds XI, Triangle Development Co., Elizabeth A. Lynn Trust, Hermes Associates, and Panos Properties, LLC–I, Appellants,**

v.

**ERNST HOME CENTER, INC., EDC, Inc., FADCO, LLC, and Official Committee of Unsecured Creditors, Appellees.**

**BAP No. WW–97–1228–RHME.
Bankruptcy No. 96–10129.**

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted Feb. 19, 1998.

Decided May 20, 1998.

Dillon E. Jackson, Brian Buckley, Foster, Pepper & Schefelman, Seattle, WA, for BC Brickyard Associates, et al.

Timothy W. Dore, Ryan, Swanson & Cleveland, Seattle, WA, for Ernst Home Center, Inc., et al.

Alan D. Smith, Perkins Coie, Seattle, WA, for FADCO.

Before: RUSSELL, HAGAN, and MEYERS, Bankruptcy Judges.

## OPINION

PER CURIAM:

This is an appeal from the bankruptcy court's approval of three orders: (1) an order that approved the debtor's entering into an agreement with a third party under which the third party paid the debtor for three fee interests in real properties and the "bonus value" of the majority of the debtor's remaining long term nonresidential real property leases, over the appellants' objections; (2) an order that extended the time for the debtor to assume or reject these leases for up to fourteen months, subject to exclusions and exceptions, over appellants' objections; and (3) an order that denied the appellants' motion for a stay pending appeal. We DISMISS.

## I. FACTS

On July 12, 1996, Ernst Home Center, Inc. ("Ernst"), once one of the leading home improvement, hardware, and garden retailers in the northwestern United States, filed a voluntary chapter 11 [1] petition. Although it attempted to reorganize, in November 1996 Ernst's management determined that reorganization was not feasible and that Ernst should close its remaining retail stores, liquidate its inventory, and go out of business. One of the principal assets of the remaining bankruptcy estate was the, "bonus

---

**1.** Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330 and the Federal Rules of bankruptcy Procedure, Rules 1001–9036.

value"[2] of its long term real property leases, many of which were at rental rates much lower than current market rents.

Appellants BC Brickyard Associates, Ltd., LCF Associates II LLC., Capital Village Associates, Price Development Co., Century Properties Funds XI, Triangle Development Co., Elizabeth A. Lynn Trust, Hermes Associates, and Panos Properties L.L.C.–I are the owners of the shopping centers of ten of Ernst's locations and comprise the Unofficial Landlords' Committee (the "Landlords' Committee").

The following information regarding the locations each appellant owns and the status of the lease(s) was provided by the appellees. BC Brickyard Associates, Ltd. is the owner of the shopping center in Salt Lake City, Utah where store number 263 is located.[3] LCF Associates II LLC. owns an office building in Seattle, Washington called the Decatur Building.[4] Capital Village Associates owns the location of store number 250 in Olympia, Washington.[5] Price Development Co. owns the shopping center for store number 290 in Bountiful, Utah. Century Properties Funds XI is the landlord for store number 227 in Shadle (Spokane), Washington.[6] Triangle Development Co. owns the location of store number 271 in Longview, Washington.[7] The Elizabeth A. Lynn Trust owns the Kennewick, Washington shopping center.[8] Hermes Associates owns the shopping centers for store number 287 in Fort Union, Utah and store number 292 in Orem, Utah.[9]

Panos Properties L.L.C.–I owns the shopping center where store number 266 is located in Mill Creek, Washington.[10]

On September 26, 1996, the bankruptcy court entered an order that authorized the sale of six store locations to AOS Investments LLC ("AOS"), and AOS's management of an additional eighteen store locations in accordance with an agreement between Ernst and AOS. This agreement provided that AOS would market these leases to third parties. In November 1996, when Ernst's liquidation plan was approved, the bankruptcy court also approved the retention of AOS by Ernst to act as its liquidation consultant. In this role, AOS determined that in order to both preserve and enhance the value of the leases for the estate, it needed to look for a purchaser of the entire Ernst leasehold estate. This was necessary because there was a demand for smaller spaces. In order to meet these demands, Ernst's locations would need to be subdivided, a project that would require capital and time assets, neither of which Ernst had.

AOS commenced a search for a purchaser, but because of the sheer size of the portfolio and the monthly carrying costs involved, it was able to identify only three potential purchasers. Of these three firms, only Farallon Capital Management, LLC ("Farallon") expressed an interest.

From the beginning, Farallon requested that Alamo Group II, LLC ("Alamo"), an affiliate of AOS, be involved as a partner in

2. A "bonus value" occurs when "the capitalized then fair rental value for the remaining term of the lease, plus the value of any renewal right, exceeds the capitalized value of the rental the lease specifies." *Alamo Land & Cattle Co., Inc. v. Arizona*, 424 U.S. 295, 304, 96 S.Ct. 910, 916, 47 L.Ed.2d 1 (1976).

3. According to the appellees, the Brickyard location is the subject of a contested assumption and assignment matter pending before the bankruptcy court, with the Musicland Group, Inc. as retail tenant.

4. This location is an office building, not a shopping center. The Decatur building is in the final stages of negotiation for a consensual assumption, assignment, and sublease transaction.

5. This location was the subject of a contested assumption and assignment matter before the

bankruptcy court, with Liquidation World as the proposed retail tenant, but the deal fell through.

6. The Shadle lease was rejected effective August 20, 1997.

7. This location was the subject of a contested assumption and assignment matter pending before the bankruptcy court with Staples, Inc. as the proposed retail tenant, but the deal fell through.

8. This lease was rejected effective June 21, 1997.

9. The Orem lease was rejected effective June 21, 1997.

10. A notice of assumption, assignment, and subleases to Ace Hardware and Party World is pending for this location.

the transaction because Farallon would primarily be a financial partner and investor and would not be prepared to handle the day to day leasing responsibilities and marketing activity. Farallon's request to have Alamo involved was disclosed to Ernst at the very first meeting, and AOS's involvement was disclosed to the Official Committee of Unsecured Creditors ("unsecured creditors' committee") and the secured lenders. Appellee FADCO, LLC ("FADCO") is a limited liability company whose members include Alamo and FADCO Northwest Investors, LLC, an affiliate of Farallon.

In February 1997, Ernst filed two motions with the bankruptcy court: (1) a motion for an order approving an agreement with FADCO for the sale and other disposition of certain leasehold interests and fee interests in real properties and related relief (the "FADCO Agreement" or "Agreement"), and (2) a motion to extend the time within which to assume or reject certain unexpired nonresidential real property leases.

The FADCO Agreement was subject to higher and better offers but none were obtained. Under the FADCO Agreement, Ernst proposed to sell to FADCO three fee interests in real property and 59 leasehold interests (the "FADCO leases"). It provided FADCO the right to direct Ernst to assume and assign the FADCO Leases to a designee of FADCO or to reject any of these leases. The FADCO Agreement gave FADCO fourteen months to direct Ernst to assume or reject the leases, and provided that FADCO would pay the ongoing occupancy costs of the leases, approximately $1.6 million each month, until the leases were assumed or rejected.

FADCO's purchase price for the fee interests and the leasehold interests was $16 million, subject to a downward adjustment of no more than $4 million if any FADCO Lease became an "excluded lease" as defined in the Agreement. FADCO would pay $10 million in cash at closing and the balance in six consecutive monthly installments, plus eight percent interest per annum. A deposit of $1.6 million had already been paid. If the FADCO Agreement was terminated, Ernst would reacquire all right, title, and interest

in the FADCO Leases, excepting those that had already been assumed and assigned. As a result, if FADCO was unsuccessful in locating end-use tenants that satisfied the provisions of § 365, it would not recover the purchase price it had paid. There was also no guarantee that the bankruptcy court would approve FADCO's proposed assignees.

Although the Landlords' Committee objected to Ernst's motions, the bankruptcy court granted both motions on March 10, 1997. In granting the order approving the FADCO Agreement, the bankruptcy court found that there was an articulated business judgment for the transaction. First, it found that Ernst would obtain a minimum of $12 million for the estate, a fair value based upon the evidence presented. Second, Ernst would relieve itself of the obligation of paying the monthly carrying costs, which it would not have been able to pay for much longer. Since these leases were the only significant unsecured assets in the estate, Ernst needed to realize immediate value or it would not have been able to pay the carrying costs and would have had to reject the leases, thereby forfeiting any value in these assets.

The FADCO Agreement was contingent upon a fourteen month extension being granted, in which FADCO could direct Ernst to assume or reject the leases. After considering a variety of factors and balancing the landlords' and estate's interests, the bankruptcy court granted the fourteen month extension. It gave careful consideration to the landlords' concerns about the locations being "dark" and balanced their concerns against the benefit to the estate. The bankruptcy court determined a fourteen month extension was appropriate due to the difficulty of marketing the spaces, the significant tenant improvements that would need to be made, potential tenants' lease approval processes, and the large number of leases. However, the court made an exception for four landlords, including appellants Century Properties Funds XI and Price Development Co., who alleged that their leases with Ernst had continuous operations clauses. Century Properties Funds XI also demonstrated that the fourteen month extension would impose too great a hardship on it because three of its

five anchor tenants were already in bankruptcy. The bankruptcy court gave Century Properties Funds XI and Price Development Co. the right, after a two month period, to file separate motions for a reduction of the fourteen month extension as it applied to them. The court also allowed any landlord to move the court, after August 11, 1997, to compel assumption or rejection of a lease based upon FADCO's failure to "diligently or in good faith market such lease." In addition, the court gave each of the landlords the right, after February 27, 1998, to make a motion to compel assumption or rejection of a particular lease based on material hardship and FADCO's failure to diligently market its lease.

After the bankruptcy court granted both of Ernst's motions, the Landlords' Committee moved the bankruptcy court for a stay pending appeal. The court found that the Landlords' Committee had failed to establish the requisite elements and denied the stay.

The Landlords' Committee appeals the bankruptcy court's orders granting Ernst's motions to approve the FADCO transaction and authorize a fourteen month extension under § 365(d)(4). It also appeals the denial of its motion for a stay pending appeal. The appellees filed supplemental information regarding the status of the leases.

## II. ISSUE

Whether the appeal is moot.

## III. STANDARD OF REVIEW

■ Mootness is a jurisdictional issue which can be raised *sua sponte*, *In re Omoto*, 85 B.R. 98, 99–100 (9th Cir. BAP 1988), and is reviewed *de novo*. *See In re Arnold & Baker Farms*, 85 F.3d 1415, 1419 (9th Cir. 1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 681, 136 L.Ed.2d 607 (1997); *In re Baker Drake, Inc.*, 35 F.3d 1348, 1351 (9th Cir. 1994).

## IV. DISCUSSION

■ The general principles of mootness require that an appeal must be dismissed when the appellant fails to obtain a stay pending appeal and events occur which pre-vent the appellate court from fashioning any effective relief. *In re Roberts Farms, Inc.*, 652 F.2d 793, 797–98 (9th Cir.1981); *In re Beatty*, 162 B.R. 853, 856 (9th Cir. BAP 1994); *In re Tucson Self–Storage, Inc.*, 166 B.R. 892, 896 (9th Cir. BAP 1994). This is true even if the dispute were to be decided in favor of the appellant. *In re Southwest Products, Inc.*, 144 B.R. 100, 104 (9th Cir. BAP 1992). Effective relief is particularly difficult to fashion where the rights of third parties are affected. *Id.*, at 105.

■ Once the bankruptcy court denied the Landlords' Committee's motion for a stay pending appeal, the transactions contemplated by the FADCO Agreement were closed and the real property and other transfers accomplished. Upon closing, FADCO paid approximately $12.5 million to Ernst. Ernst is no longer in possession of that money because it has been distributed to the creditors entitled to the funds in accordance with the postpetition financing agreements, and has also been used to pay ongoing administrative expenses of the chapter 11 case. Since the closing, FADCO has also paid Ernst the balance due in six monthly installments, and has continued to pay the recurring costs as required under the FADCO Agreement. These carrying costs have been paid to the landlords, taxing authorities, and others as required by the leases. The landlords whose leases have not been rejected have been paid all postpetition amounts due under their respective leases. As of the date of this appeal, FADCO has paid a total of $24,385,700 to Ernst under the FADCO Agreement: $15.9 million in principal, approximately $140,000 in interest, and approximately $8.4 million in reimbursement of carrying costs.

In addition to these financial transactions, the FADCO leases and fee interests have also been the subject of numerous transactions which would be difficult, if not impossible, to unwind. Of the three fee interests acquired under the FADCO Agreement, one has been leased to an independent third party, and the other two have been returned to the secured creditor in uncontested foreclosure proceedings. As of the date of this appeal, the status of the fifty-nine leasehold

interests FADCO acquired is as follows: eight have been assumed and assigned, five are the subject of pending assumption and assignment proceedings, ten have been or will be terminated through consensual agreements with the landlords, eight are in the final stages of negotiation, with complete sublease or assignments expected, twenty-four were rejected, and only six are in a comparable position to the position they were in prior to the date of the FADCO transaction's closing.

It would be inequitable and impractical, if not impossible, to attempt to unwind the FADCO transaction. This Panel is prevented from fashioning any effective relief and this appeal is rendered moot due to the significant change in circumstances which resulted once the bankruptcy court denied the appellants' motion for a stay pending appeal.

## V.  CONCLUSION

As a result of the complexity of the concluded FADCO transaction, and the impracticality and unfairness that would result if it were unwound, we DISMISS this appeal as MOOT.

RUSSELL, Bankruptcy Judge, concurring.

While I agree with the majority that this appeal is moot, I will address the remaining issues in order to make the record clear.

## I.  ISSUES

A.  Whether the bankruptcy court abused its discretion in denying the Landlords' Committee's motion for a stay pending appeal.

B.  Whether the bankruptcy court erred in approving the sale of Ernst's leasehold interests and fee interests in real properties to FADCO.

C.  Whether the bankruptcy court abused its discretion in granting Ernst a fourteen month extension of time in which to assume or reject the nonresidential real property leases.

## II.  STANDARD OF REVIEW

The Ninth Circuit Bankruptcy Appellate Panel ("BAP") reviews the bankruptcy court's conclusions of law *de novo* and its findings of fact for clear error. *In re Burdge,* 198 B.R. 773, 776 (9th Cir. BAP 1996). The BAP reviews the interpretation of statutory provisions *de novo.* *In re Victoria Station Inc.,* 875 F.2d 1380, 1382 (9th Cir.1989); *In re Port Angeles Waterfront Associates,* 134 B.R. 377, 379 (9th Cir. BAP 1991).

An order to extend the time to assume or reject nonresidential real property leases is subject to the abuse of discretion standard. *Theatre Holding Corp. v. Mauro,* 681 F.2d 102, 105 (2d Cir.1982). A decision reviewed for abuse of discretion will be overturned only if there was a clear error of judgment by the bankruptcy court. *In re Basham,* 208 B.R. 926, 930 (9th Cir. BAP 1997).

## III.  DISCUSSION

A.  *Whether The Bankruptcy Court Abused Its Discretion In Denying The Unofficial Landlords' Committee's Motion For A Stay Pending Appeal*

Rule 8005 provides that a motion for a stay of an order pending appeal must be presented to a bankruptcy judge. If denied, it must then be made to a district court or bankruptcy appellate panel with an explanation of why the relief was not obtained from the bankruptcy judge.

Thus, the proper procedure after denial of a stay pending appeal by a bankruptcy court is *not* to appeal the denial, but rather to request a stay directly from the BAP. Therefore, no appeal may lie from the bankruptcy court's denial of the stay requested by the Landlords' Committee.

B.  *Whether The Bankruptcy Court Erred In Approving The Sale Of Ernst's Leasehold Interests And Fee Interests In Real Property To FADCO*

1.  *Section 363(b)(1)*

Under § 363(b)(1), the trustee,[11] "after notice and a hearing, may use, sell, or lease,

---

**11.** Section 1107 provides that a debtor in posses-  sion shall have all the rights, and shall perform

other than in the ordinary course of business, property of the estate." Section 541(a)(1) provides that the estate includes any "legal or equitable interest in property." The Landlords' Committee argues on appeal that the bankruptcy court erred in its determination that Ernst's nonresidential leasehold interests were property of the estate that could be sold under § 363(b)(1).

In support of its argument, the Landlords' Committee relies on *In re Lovitt*, 757 F.2d 1035, 1041 (9th Cir.), *cert. denied sub nom.*, 474 U.S. 849, 106 S.Ct. 145, 88 L.Ed.2d 120 (1985), in which the Ninth Circuit stated that the trustee must make an affirmative act of assumption to bring the property into the estate "in order to ensure that the estate is not charged with the liabilities except upon due deliberation." The Landlords' Committee also relies on *In re Tleel*, 876 F.2d 769, 770 (9th Cir.1989) and *In re Moreggia & Sons, Inc.*, 852 F.2d 1179, 1185 (9th Cir. 1988). The Landlords' Committee also cites to *Collier's on Bankruptcy* as support for its argument that a lease must be assumed in order to be property of the estate. The Landlords' Committee urges that not requiring assumption of an executory contract or lease considered to be property of the estate would strip the debtor of time to assess whether to accept its obligations under the lease and alleges that this "comports with the principle that rejection of a lease is retroactive to the time of filing."

In arguing that the leases should not be considered a part of the bankruptcy estate, the Landlords' Committee also contends that what is really being sold is the "power . . . to forestall the obligations under the leases while it attempts to realize some value for them" and that this power could not be acquired under state law. In support of this argument, appellants cite to *U.S. v. Whiting Pools, Inc.*, 462 U.S. 198, 205, 103 S.Ct. 2309, 2313–14, 76 L.Ed.2d 515 (1983) in which the Supreme Court stated that " § 541(a)(1) is intended to include in the estate any property made available to the estate by other provisions of the Bankruptcy Code." Appellants emphasize the Supreme Court's use of the word "property" rather than "power,"

the latter of which is what they allege is being sold in this case.

As a last argument, the Landlords' Committee points out that the provisions and protections of the Code were tailored and intended for the benefit of the trustee or debtor in possession, and not for third parties. It claims that Ernst "can no more 'sell' FADCO its right to assume a lease than it could 'sell' FADCO the right to avoid a transfer or discharge of its debts."

In response, appellees contend that the cases the Landlords' Committee relies on in arguing that the leases are not property of the estate only point out that the Code generally does not require trustees to render performance under leases or executory contracts prior to assumption, because doing so would burden the estate with administrative obligations that may not be in the estate's best interests. They also point out that these cases followed Bankruptcy Act cases such as *In re McCrory Stores Corp.*, 69 F.2d 517 (2d Cir.1934), that held that the trustee does not take title to executory contracts and unexpired leases until the affirmative act of assumption has occurred. The appellees also argue that none of these cases involved the bonus value of leases and that none of them held that the "debtor's *interest* in the lease or executory contract is not property of the estate prior to assumption." The appellees argue that "[w]hether or not *title* to an unassumed lease of a debtor vests in the trustee, bonus value is a wholly different asset" and point to the fact that FADCO has paid Ernst over $20 million in purchase price and recurring carrying costs for the bonus value of the FADCO leases as evidence that bonus value is property.

In further support of this proposition, the appellees note that § 541(a)(1) includes "all legal or equitable interests of the debtor in property." They contend that the Supreme Court has established that a tenant's interest in the bonus value of a lease is "property" subject to the protections of the Fifth Amendment of the Constitution. *See Alamo Land & Cattle Co. v. Arizona*, 424 U.S. 295, 96 S.Ct. 910, 47 L.Ed.2d 1 (1976). The ap-

all the functions and duties, of a trustee serving    in a case under this chapter.

pellees also argue that 541(a)(1) has been read to include: net operating losses, *In re Prudential Lines, Inc.*, 928 F.2d 565, 569–73 (2d Cir.1991), *cert. denied sub nom.*, 502 U.S. 821, 112 S.Ct. 82, 116 L.Ed.2d 55 (1991); the equity of redemption after a foreclosure sale, *In re Brown*, 734 F.2d 119 (2d Cir.1984); contract rights in general, *In re Verco Industries, Inc.*, 704 F.2d 1134 (9th Cir.1983); and proceeds of all of the above, § 541(a)(6). Given the wide scope of this section, the appellees argue that it is unlikely that Congress intended to exclude from the definition of the property of the estate such a potentially valuable asset.

The appellees also counter that the legislative history and commentators recognize that leasehold interests, such as the ones at issue in this case, are property of the estate even if they have not yet been assumed. "The debtor's interest in property also includes 'title' to property, which is an interest, just as are a possessory interest, or leasehold interest, for example." H.R.Rep. No. 595, 95th Cong. 1st Sess. 367 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6323.

The bankruptcy court did not err when it determined that the bonus value of the debtor's real property leases constituted property of the estate. The bonus value, which is a proceed from a lease contract, is clearly property of the estate. In addition, since an unassumed nonresidential lease constitutes property of the estate, the Committee's argument that what FADCO purchased was a power to "forestall the obligations under the leases while it attempts to realize some value from them" is without merit.

In response to the appellants' concern that the "FADCO Agreement offends both the letter and spirit of the Bankruptcy Code" by placing the debtor's "powers ... on the auction block," it must be emphasized that the bankruptcy estate stood to gain a minimum of $12 million in the transaction while FADCO took the risk that it would lose on the deal. This benefit furthered, rather than offended, the letter and spirit of the Code.

### 2. *Conflict of interest*

Appellants next urge that the FADCO Agreement is void because of a conflict of interest between AOS and FADCO in violation of §§ 327 and 328, and that FADCO acted in bad faith in entering into the transaction.

Appellants allege that because Alamo was a member of both AOS and FADCO, an unavoidable appearance of impropriety occurred which should void the transaction. First, the Landlords' Committee points to the fact that Donald Gaube, President of Alamo, signed the FADCO Agreement for FADCO as the buyer and for AOS as the broker. Next, the Landlords' Committee states that AOS had a duty under its prior agreement to use its best efforts to market the Ernst leases to third parties in armslength transactions, and alleges a conflict because AOS, as an affiliate of FADCO, also had an interest in seeing as many leases as possible included in the FADCO Agreement. The Landlords' Committee also claims that the lack of proof that the FADCO Agreement was advertised so that other parties could be given the opportunity to bid evidenced improper conduct. To further support their arguments, the appellants cite to *Donovan & Schuenke v. Sampsell*, 226 F.2d 804, 811 (9th Cir.), *cert. denied*, 350 U.S. 895, 76 S.Ct. 152, 100 L.Ed. 787 (1955), which stated that "[a] fiduciary cannot purchase property which he is empowered to sell."

In response, the appellees argue that the FADCO Agreement was a fair one and that FADCO was not guilty of any improprieties. For support, they point out that a financial advisor for Ernst concluded that the FADCO transaction was consistent with its expectations of value from its lease portfolio and that individual marketing of the leases would not yield a greater return. They also note that the FADCO Agreement was publicized and that evidence of the publicity was submitted in February of 1997. A sworn statement by the advertising clerk for the *Wall Street Journal* was submitted along with a copy of the advertisement. An affidavit of publication was submitted proving that the same notice was also printed in the *Seattle Times*.

The appellees also argue that the appellants' reliance on *Donovan & Schuenke v. Sampsell* is misplaced because "it is no long-

er good law, as it was decided before § 363(m) and its predecessor Bankruptcy Rule were in effect."

In its decision, the bankruptcy court stated that it was "not persuaded that Alamo's participation in the FADCO entity constitute[d] a conflict of interest." It noted that the purchase price paid by FADCO equaled the value of the FADCO Leases as determined by Ernst and that members of the unsecured creditors' committee and its consultants reviewed the transaction in great detail and found no improprieties.

The record provides substantial evidence of the absence of any conflict of interest. First, in its role as liquidation consultant, it was AOS's duty to maximize the estate's value and it believed that the most effective way to do so would be to sell all of Ernst's leasehold interests to one firm. It approached three different firms but only Farallon was interested. It was Farallon who insisted that Alamo be involved in the deal. Since Alamo was a member of both AOS and FADCO, Ernst, its consultants, creditors, and the bankruptcy court were aware that they would have to scrutinize the transaction very closely.

After close examination, each of these parties concluded that the deal was a fair one. Ernst's financial advisor concluded that the purchase price was consistent with Ernst's expectations of value from its lease portfolio and that individually marketing the leases would not yield a greater return. In fact, Ernst insisted that the purchase price under the FADCO Agreement had to be what it believed was the full value of the leases. One of Ernst's consultants was successful in negotiating a $1 million increase in Farallon's offer and was able to persuade Farallon to agree to pay Ernst's February, 1997, carrying costs (approximately $1.5 million).

The unsecured creditors' committee, after meeting with its own set of professionals, voted unanimously to support the FADCO Agreement. The bankruptcy court scrutinized the deal closely to ensure that that committee's interests were being furthered and relied on the fact "that those accountants looked at this transaction and determined that it was a sound one." It accurately described the landlords' objections when it said that "if there was no involvement ... of AOS and/or Alamo in the FADCO [A]greement ... they would still object to the transaction."

In asserting that Donald Gaube's signature on the FADCO Agreement was "both on behalf of FADCO, as buyer, and on behalf of AOS, as broker," the appellants failed to notice that AOS joined the agreement only to make representations, warranties, and acknowledgments and to agree to the provisions in paragraph 15. Paragraph 15 is titled "Consulting Agreement: Disclosure." Nothing in this paragraph is of any consequence to the landlords, and their concern is unjustified.

Again, not only does the Landlords' Committee fail to point to any concrete evidence, it overlooks the abundance of evidence submitted by Ernst and AOS contradicting it. The President of Alamo stated that after the letter agreement between Ernst and AOS was signed in November of 1996, he visited each of the properties to which he was assigned and ascertained each location's characteristics and trade area, researched market rents and completed transactions in the area, drove the trade area to understand traffic patterns, took photographs of each location for future reference, met with Ernst management and its consultants to review each property individually and agree upon the value and marketability, researched major retailers that were expanding in the Pacific Northwest and might be interested in multiple transactions and sent a letter to sixty-two of them, caused lease signs to be placed in the windows, received daily reports of incoming calls concerning the Ernst locations, directed that over 100 home improvement and hardware retailers in the Northwest be contacted, was in daily contact with potential tenants, compiled reports about various aspects of Ernst's locations and made a reference book, and met with or had phone conversations with each of Ernst's landlords. Sam Rosenwald, who was responsible for other Ernst locations, did the same thing. Clearly, AOS took all necessary steps to profitably market the estate property.

The Landlords' Committee's allegations of a conflict of interest are without merit. In the bankruptcy court's words, it is "disingenuous ... for landlords to be concerned about the conflict ... [the landlords'] conflict is, why would they want FADCO to have these leases when the landlords themselves could get back below-market leases and realize that value themselves?" The bankruptcy court did not err in rejecting the appellants' conflict of interest allegations.

### 3. *Bad faith*

The Landlords' Committee also argues that "in addition to the stain of conflict and self-interested dealing," there is also evidence of bad faith. Again, the Landlords' Committee's claim is without merit and is contradicted by the evidence presented.

In their opening brief, the appellants argue that "the record reveals ... that at the time the FADCO Agreement was being considered, only one of the approximately 60 leases entrusted to AOS' [sic] care had been assumed and assigned, and AOS had done nothing more to secure that assignment than act as a listing broker." From this, the Landlords' Committee requests that the inference be drawn that it was the intent of FADCO to force the landlords to "ransom their leases or sell their shopping centers." The Landlords' Committee also alleges that FADCO tried to increase its leverage by proposing inappropriate tenants.

The appellees respond by pointing to the record and the lack of evidence to support the appellants' contentions. They note that several declarations and many pages of testimony were dedicated to establishing that AOS had made substantial efforts to market the leases. Alleging that the record is devoid of any evidence supporting the appellants' allegations of bad faith, the appellees argue that the only reason the landlords disapprove of the FADCO transaction is because they will not be able to retain the bonus value of the leases for themselves.

In its decision, the bankruptcy court noted that the landlords had failed to produce any evidence that FADCO intended to force the landlords to "buy out" their leases. On the contrary, it found that there was credible evidence that FADCO intended to diligently market the FADCO Leases and obtain end-use tenants in accordance with § 365 whenever possible. It also noted that it was not in FADCO's interest to maintain the leases for an extended period of time, at a cost of approximately $1.6 million each month, only to see if the landlords would buy out their leases. Although acknowledging that Ernst had received "substantial consideration from landlords who have agreed to buy out their leases in exchange for a rejection and termination of their leases," the bankruptcy court stated that this was "nothing more than a recognition by those landlords of the same fact recognized by Ernst and FADCO—these leases have significant value."

The appellants' inference that the landlords were forced to "ransom their leases or sell their shopping centers" mischaracterizes and contradicts the evidence submitted to the bankruptcy court. The record reveals that of the 24 leases that were a part of the initial agreement between Ernst and AOS, there were six lease rejections, five lease terminations with partial or full waivers of bankruptcy claims, three landlord buyouts with tenants being brought to the table, one lease to a retailer, six pending deals with retailers, each with a letter of intent, two that were in negotiation, and one with interested parties. One of the landlords that the appellants rely on in arguing that FADCO was in bad faith failed to return forty-five phone calls from Mr. Gaube, the President of Alamo. Substantial testimony was also given as to the length of time that it takes to market and secure retailers, and the time that it takes retailers to go through their internal lease approval process, as evidence that there was no bad faith.

The evidence also shows that FADCO was assuming a large financial risk and would not benefit from a strategy of trying to force out landlords. In addition to paying "upfront," FADCO was paying the marketing expenses and carrying costs of approximately $1.6 million per month. In fact, the longer a space remained vacant, the less FADCO would net on any future sale of a lease. As the bankruptcy court noted, FADCO also ran the risk that the bankruptcy court would not approve

any of its proposed assignees, therefore paying at least $12 million for nothing. Although FADCO did approach two shopping center landlords about selling their centers,[12] these offers were not accepted and the landlords are not parties to this action, indicating that they do not object to the FADCO transaction.

The bankruptcy court did not err in finding that there was no bad faith involved in the FADCO transaction, given the absence of any evidence of bad faith in the record.

C. *Whether The Bankruptcy Court Abused Its Discretion In Granting Ernst a Fourteen Month Extension Of Time In Which To Assume or Reject The Nonresidential Real Property Leases*

The Landlords' Committee next urges that the bankruptcy court abused its discretion in granting a fourteen month extension to Ernst under § 365(d)(4), which permits a court to extend the time to assume or reject a lease for "cause."[13] The provisions of Section 365 have been informally referred to as the "Shopping Center Amendments" to the Code, which were intended to protect the interests of landlords in shopping centers. The appellants acknowledge that since "cause" is not defined, courts generally look to the following factors for guidance: (1) whether the lease is the primary asset of the debtor; (2) whether the lessor has a reversionary interest in the building built by the debtor on the landlord's land; (3) whether the debtor has had time to intelligently appraise its financial situation and the potential value of its assets in terms of the formulation of a plan; (4) whether the lessor continues to receive the rent required in the lease; (5) whether the lessor will be damaged beyond the compensation available under the Code due to the debtor's continued occupation; (6) whether the case is exceptionally complex and involves a large number of leases; (7)

whether the need exists for a judicial determination of whether the lease is disguised as a security interest; (8) whether the debtor has failed or is unable to formulate a plan when it has had more than enough time to do so; and (9) any other factors bearing on whether the debtor has had a reasonable amount of time in which to decide whether to assume or reject the lease. *See, e.g., In re Victoria Station, Inc.,* 88 B.R. 231 (9th Cir. BAP 1988), *aff'd,* 875 F.2d 1380 (9th Cir. 1989); *In re Wedtech Corp.,* 72 B.R. 464, 471–73 (Bankr.S.D.N.Y.1987). This list is not exclusive, and a great deal of discretion is left to the court to weigh *all* relevant factors related to the requested extension.

The Landlords' Committee argues that each of these factors addresses whether the debtor has had reasonable time to determine whether to assume or reject a lease. They allege that Ernst did not need the extension to "intelligently appraise" its financial situation or to decide whether to assume or reject the leases. As a result, the appellants contend that the bankruptcy court "disregarded the proper standards for determining cause and extended the default time period, established by Congress for the protection of the landlords, without the debtor showing any need for such an extension." They also claim that the bankruptcy court "unabashedly granted the extension solely for the pecuniary benefit of a non-debtor third party."

The appellants next argue that the balance of harms favored the landlords, who had submitted "substantial evidence regarding the adverse impacts of a continually dark anchor tenant," rather than Ernst, whose "only response to its obligation to show cause was its reliance on the fact that FADCO had demanded an extension."

As a last argument, the Landlords' Committee contends that a fourteen month extension is "entirely beyond the realm of reasonableness." As support for this argument,

**12.** FADCO indicated an interest in two shopping centers, the Green Firs Shopping Center in Tacoma and the Meridian Place Shopping Center in Puyallup, but the landlords, neither of which is a party to this action, expressed no desire to sell.

**13.** Section 365(d)(4) states that "if the trustee does not assume or reject an unexpired lease of

nonresidential real property under which the debtor is the lessee within 60 days after the date for order of relief, or within such additional time as the court, for cause, within such 60–day period, fixes, then such lease is deemed rejected, and the trustee shall immediately surrender such nonresidential real property to the lessor."

they rely on the absence of any case involving an extension of the length at issue here. Since the extension is "unprecedented," the appellants conclude that granting it was a "manifest abuse of discretion."

The appellees respond to the contention that the bankruptcy court erred in weighing the relevant factors by pointing out that the bankruptcy court not only went through each of the relevant factors, but it considered additional factors it deemed important. As examples, the appellees note that the bankruptcy court considered the "magnitude of the benefit to the estate from granting an extension motion," the "differences between liquidation and reorganization cases," the facts that the FADCO Agreement would be of no benefit to the estate without an extension that would allow sufficient time to market the leases and that the principal beneficiaries of the FADCO Agreement were Ernst's creditors who supported the Agreement, and the special circumstances present when shopping centers are involved.

The appellees also respond by contending that the appellants overlook the modifications that the bankruptcy court made to the extension order to accommodate the landlords' interests. The modifications to the order included special time periods and exclusions for the landlords who alleged that their leases with Ernst had continuous operations clauses, and gave any landlord the right to petition the bankruptcy court to require Ernst to assume or reject a lease if it could show FADCO was not making a good faith effort to market its lease.[14] They also point out that the bankruptcy court conditioned the extension order on the entry of the FADCO Approval Order and closing of the transactions under the FADCO Agreement, "thus ensuring that the principal benefit to the estate from the transactions would actually be enjoyed by the debtor." The appellees argue that each of these provisions establish that the bankruptcy court "properly focused on the appropriate factors—including harms which the landlords might suffer—in exercising [its] discretion."

The appellees also argue that the appellants fail to acknowledge that most of the harm they perceive they would suffer from the extension was cured by the bankruptcy court's modifications to the extension order, and that they are therefore protected if FADCO were not to uphold its end of the bargain. They also contend that there is nothing in § 365(d)(4) which requires the bankruptcy court to give the landlords an opportunity to come back to the court and argue that the extension be shortened.[15] Even though it was not required, the bankruptcy court allowed the landlords to do so, and the appellees argue it gave the landlords "more than that to which they were entitled."

The appellees next contend that the appellants are not any worse off under the extension order than they would be under the applicable state law, and argue that "the courts should not read in protections for which the landlord did not itself bargain." As support, the appellees point out that the landlords "were and are being paid currently on their leases. All postpetition obligations are being satisfied as they become due." The appellees note that "[t]here is nothing under state law or the relevant leases which would prohibit a tenant from paying rent and leaving the premises dark." As a result, the appellees argue that the harm that the landlords allege is not the result of the extension order or any other factor present in the bankruptcy case.

---

**14.** The court gave four landlords, including appellants Century Properties Funds XI and Price Development Co., who alleged that their leases with Ernst had continuous operations clauses, the right, after a two month period, to file separate motions for a reduction of the fourteen month extension as it applied to them.

The court also allowed any landlord to file a motion, after August 11, 1997, to compel assumption or rejection of a lease based upon FADCO's failure to "diligently or in good faith market such lease." In addition, the court gave each of the landlords the right to file a motion,

after February 27, 1998, to compel assumption or rejection of a particular lease based on material hardship and FADCO's failure to diligently market its lease.

**15.** The appellees argue that although § 365(d)(2) allows a party to an unexpired lease to request the bankruptcy court to shorten the otherwise applicable time periods to assume or reject the lease, § 365(d)(4) has no such provision. They contend that this distinction must be intentional in the presence of a unified statutory scheme.

In response to the appellants' claim that the fourteen month extension was unprecedented and therefore erroneous, the appellees point to the evidence that was submitted in support of the request for an extension. This included evidence that obtaining the extension was a condition to Ernst obtaining the benefits under the FADCO Agreement, and the testimony and declarations about the need for a fourteen month extension. They contend that "[t]he landlords' evidence as well as [a]ppellees' evidence showed … that these leaseholds were not easy to market quickly no matter who was in control of the leasing process."

The bankruptcy court carefully weighed each of the relevant factors and considered the particular concerns of each landlord, and addressed each in its oral opinion. Although not necessary, the court did this because it agreed with the reasoning in *Escondido Mission Village, L.P. v. Best Products Co.*, 137 B.R. 114 (S.D.N.Y.1992), which stated that if a number of landlords object to a debtor's request for an extension under § 365(d)(4), the court must consider the particular concerns of each landlord.

The bankruptcy court found that although appellant BC Brickyard Associates, Ltd. ("Brickyard") claimed that another tenant could reduce the rent if the Ernst store remained dark, there was no continuous use provision in the lease. It also determined that if FADCO were not paying the ongoing carrying costs, Brickyard would stand to lose $15,000 a month while it looked for a tenant.

For Century Properties Funds VI ("Century"), which owned the Shadle Shopping Center, the court pointed out that although Century alleged it would be injured by the loss of approximately $27,000 a year in percentage rent, since the monthly carrying cost for this lease was slightly over $9,000, it would only take a three month vacancy for the landlord to lose the same amount of money if FADCO were not involved. However, the court noted that because three of its five anchor tenants were dark and in

bankruptcy, Century was in a different position than the others. In addition, the court took note that Century's lease with Ernst may have had a continuous operation clause and thus gave this landlord special treatment.[16]

The court next noted that it would take the Elizabeth A. Lynn Trust, landlord for the Kennewick location, two months to lose the same amount of percentage rents it would lose under the FADCO Agreement. The declaration submitted by this landlord's representative alleged only general harm caused by the store being dark.

With regards to Capital Village Associates, the court noted that although this landlord might have a problem with the reduction in rents of other tenants, this was not the debtor's problem because there was no continuous use clause in this lease. The Panos Properties and TCW Realty Fund locations alleged only general objections that the court found did not justify a reduction of the extension.

In addition, Price Development Co., the landlord for the Bountiful location, alleged that another tenant would have a rental reduction because of a clause in that tenant's lease. The bankruptcy court noted that it was possible that the Bountiful location had a continuous operation clause which would have put Ernst into default. As a result, the bankruptcy court gave this landlord permission to file a motion to compel assumption or rejection after May 12, 1997, a two month extension.[17]

Since no evidence of specific harm was presented with respect to the majority of the landlords, the bankruptcy court next examined whether the landlords would suffer from harm that they would not suffer in the absence of the chapter 11 case, and whether they would be damaged beyond the compensation available to them in the Code. The court determined that there was no indication that Congress intended to give landlords more rights under the Code than they would have under state law when a tenant goes out

---

**16.** This lease has since been rejected.

**17.** Price failed to take advantage of this shortened extension. Thus, Price should not be heard

on appeal of the extension order since it was not a final order as applied to them.

of business. It determined that none of the landlords was able to establish that it had a right to terminate Ernst's lease or oust it from possession because of the cessation of business. It further determined that in the absence of continuous operations clauses in the leases, the court would not imply them. The court determined that such a substantial term would not be implied because the parties were sophisticated and the terms of the leases were unambiguous.

The court also determined that there was no evidence that the FADCO landlords would be harmed beyond the compensation available to them in the Code. All of the carrying costs would be paid during the extension period. If any landlord believed it was not receiving all of these, or that it was entitled to additional costs under the terms of its lease because the store was vacant, it had the right to petition the court for relief. In addition, if a FADCO lease were ultimately assigned and assumed, the landlord would be entitled to all of the relief afforded by § 365(b), including the payment of any amounts due under the lease prior to the petition date and any pecuniary losses suffered postpetition. The landlords whose leases were rejected would have the right to assert an unsecured claim for damages against the estate and would share in the distribution of funds.

Although the Landlords' Committee argues that a fourteen month extension is *per se* unreasonable, the substantial amount of evidence submitted by Ernst and FADCO as to why such a time length was necessary justified the bankruptcy court's decision. Testimony was presented that it took a significant amount of time to notify retailers and negotiate deals with them, and that since most potential tenants would be major retailers, their internal approval processes might take quite awhile, a factor over which Ernst and FADCO had no control. In fact, two of the witnesses had experience with national retailers and stated that the lease approval process could take four to six months once a site was chosen. In addition, one of the

witnesses testified that some deals occasionally fall through and the process must be started all over again, something "that's typical in today's environment."

Although the bankruptcy court went to great lengths to accommodate the landlords whose leases arguably contained continuous operations clauses, the leases which are the subject of this appeal did not, in fact, contain such clauses.[18] In the absence of continuous operations provisions, the bankruptcy court correctly refused to imply them.

Contrary to the allegations of the Landlords' Committee, the bankruptcy court did not dismiss the impact that a dark anchor tenant would have on each landlord; instead, the court considered each location individually. In short, the bankruptcy court was meticulous and thorough in its analysis. It not only considered the landlords' concerns, but gave the few landlords that established that they were either uniquely affected or allegedly had continuous operations clauses special attention and gave those landlords the right to file a motion to compel Ernst to assume or assign their leases within a period shorter than fourteen months. Accordingly, the bankruptcy court did not abuse its discretion in granting the fourteen month extension.

---

**18.** The Bountiful lease, one of the leases the court took caution to note may have had a continuous operation clause, did not actually have one. In fact, the lease specifically stated that

"[n]othing contained in this Lease shall be or be deemed to be or constitute a covenant or agreement by Tenant to continuously operate a business on the Leased Premises."