In re G SURVIVOR CORP.
f/k/a the Gitano Group,
Inc., et al., Debtors.

Bankruptcy Nos. 94 B 40885(JHG)
to 94 B 40902(JHG).

United States Bankruptcy Court,
S.D. New York.

Sept. 20, 1994.

Debevoise & Plimpton by Michael Wiles and Alicia Zalesin, New York City, for debtors.

Epstein Becker & Green by Bernice K. Leber and Frank J. Fanshawe, New York City, for John Forsyth Co., Inc.

LeBoeuf, Lamb, Greene & MacRae by Tracy L. Klestadt, New York City, for Official Committee of Unsecured Creditors.

## DECISION ON MOTION TO REJECT EXECUTORY LICENSING AGREEMENT

JEFFRY H. GALLET, Bankruptcy Judge.

### INTRODUCTION

Chapter 11 debtor G. Licensing, Ltd., formerly known as Gitano Licensing, Ltd., with

the support of the Official Committee of Unsecured Creditors (the "Committee"), moves[1] to reject a certain executory license agreement (the "License") with the John Forsyth Company, Inc. ("Forsyth").

## FACTS

Movant, and its co-debtors ("Gitano") was a major apparel designer and manufacturer in the United States. By far, Gitano's largest customer was Wal–Mart Stores, Inc. ("Wal–Mart"). Forsyth is a Canadian public corporation in the business of manufacturing and selling apparel under its own trademark, and those of others.

Gitano tried unsuccessfully to establish itself in Canada. Unable to materially expand into the Canadian market, in September of 1992, it granted the License to Forsyth. Under the License, Forsyth was authorized to manufacture goods and sell them in Canada under the Gitano trademark.

In June of 1993, Forsyth contracted with Woolworth Canada, Inc. ("Woolco") to make Woolco Forsyth's agent to sell Gitano trademark goods to Woolco ("The Woolco Agreement"). Gitano was not a party to this somewhat odd agreement and contends that it violates the License. Forsyth disagrees.

While that was occurring, certain senior executives and major shareholders of Gitano were engaging in illegal customs practices, which resulted in felony convictions in the United States District Court. Consequently, Wal–Mart informed Gitano that unless the company was sold, it would cease doing business with it. The loss of Wal–Mart's business would have been disastrous for Gitano. Even if it had continued in business, without Wal–Mart's orders, Gitano's assets would have been worth far less than the $100 million for which they were eventually sold.

Gitano, a large, publicly held company, retained an investment banker and set about selling itself. The sale had a practical deadline of late March of 1994 because that was when Wal–Mart's large fall and Christmas

orders had to be written. To allow another apparel maker to write those orders, and assume Gitano's shelf space in Wal–Mart's stores, would have irreparably damaged Gitano.

The investment banker sent invitations to bid on Gitano's assets to forty companies, including Forsyth and Fruit Of The Loom, Inc. ("Fruit of the Loom"). A bidding process ensued, ending on February 28, 1994 with Fruit Of The Loom's agreement to purchase Gitano's assets for $100 million, about $20 million more than any other bidder (the "Sale Agreement"). The agreement contemplated that Gitano would file a petition under Chapter 11 of the Bankruptcy Code (the "Code"). It filed on March 1.

The Sale Agreement provided that Fruit Of The Loom would purchase substantially all of Gitano's assets and listed certain executory contracts that Gitano agreed to reject. The License was not listed. However, the Sale Agreement also provided that Fruit Of The Loom had the right to designate additional contracts to be rejected, provided that the designation was made at least five days before the hearing on Gitano's motion to approve the Sale Agreement. The hearing was scheduled for March 14, 1994.

On March 7, Fruit Of The Loom notified Gitano that it wished to reject the License. On March 10, Gitano notified Forsyth of its intention to reject it.

On March 14, after a lengthy, contentious hearing, the Sale Agreement was approved. Forsyth neither filed an objection nor appeared at the hearing.

Gitano then moved to reject the License.

By that time, Woolco had closed over two hundred of its stores and severely curtailed its business activities. Wal–Mart, which had not previously been a presence in the Canadian market, purchased over two hundred of Woolco's locations and expressed an interest in carrying Gitano products in Canada. Oscar Rajsky, Forsyth's president and chief executive officer, testified to Wal–Mart's in-

---

**1.** Subject matter jurisdiction arises under 28 U.S.C. § 1334(b) and the "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York, dated July 10, 1984 (Ward, Acting C.J.). This is a core matter under 28 U.S.C. § 157(b)(2)(A).

terest in carrying Gitano goods. When asked whether Woolco was in breach of the Woolco Agreement, he answered, "not yet."

We are left with Gitano's successor, Fruit Of The Loom, and its major customer, Wal–Mart, poised to do business with each other in Canada, with Forsyth as an impediment. Were Fruit Of The Loom not in the picture, and Gitano instead was set to do business with Wal–Mart in Canada, that situation, alone, would be a reasonable basis for Gitano's rejection of the License.

Gitano additionally argues, with some persuasiveness, that the Woolco Agreement is a violation of the License. However, it is neither necessary nor appropriate for me to make a determination on that issue here. *Orion Pictures Corp. v. Showtime Networks, Inc., (In re Orion Pictures Corp.)*, 4 F.3d 1095 (2d Cir.1993), *cert. dismissed,* —— U.S. ——, 114 S.Ct. 1418, 128 L.Ed.2d 88 (1994). Gitano also argues that Forsyth is in breach of the License because it has not made certain royalty payments. Forsyth counters that it is entitled to a credit as a result of credits it gave to former Gitano customers. Similarly, I need not decide that issue here.

I am persuaded that, under the existing circumstances, it would be an appropriate business judgment for either Fruit Of The Loom or Gitano to reject the License.

Forsyth, however, argues that whether it would have been good business judgment for Gitano to reject the License, if it were going to continue in business, is irrelevant since it sold that right to Fruit Of The Loom. It avers that Fruit Of The Loom's business judgment is also irrelevant to the issue here because it is not the debtor. It disputes Gitano's contention that it breached the License and argues that, if the License is rejected, it will have an unsecured claim against Gitano's estate in excess of $20 million.

Finally, it argues that because the Fruit Of The Loom purchase price is final and not contingent on the outcome of this motion, there is no benefit to Gitano if it rejects the License. Essentially, it urges that Gitano can keep the $100 million and avoid both

hardship to Forsyth and a $20 million claim, by not rejecting the License.

Gitano answers that one of the reasons the Fruit Of The Loom purchase price for most of Gitano's assets was so high was that they came with the right to reject unfavorable executory contracts, such as the License. It contends that the right to reject certain contracts was a thing of value that increased the Fruit Of The Loom purchase price to the benefit of it creditors. Forsyth contends, without specific evidentiary support, that the unsecured creditors will receive no benefit from the Fruit Of The Loom sale.

The Committee disagrees. I am inclined to accept the Committee's judgement on what will benefit its members.

### ISSUE

Although Gitano moves to reject the License, it does so on Fruit of the Loom's behalf. The question before me then is to what extent the Code permits a debtor, in the context of an asset sale, to sell its right to reject executory contracts.

### LAW

11 U.S.C. § 365(a) provides that, "[e]xcept as provided in sections 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." The term "trustee" has been defined to include a Chapter 11 debtor-in-possession. *Fed.R.Bankr.P.* 9001(10).

In determining whether a debtor may be permitted to reject an executory contract, courts usually apply the business judgment test. Generally, absent a showing of bad faith, or an abuse of business discretion, the debtor's business judgment will not be altered. *In re Bildisco*, 682 F.2d 72, 79 (3d Cir.1982), *aff'd sub nom. N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984); *Lubrizol Enterprises v. Richmond Metal Finishers (In re Richmond Metal Finishers, Inc.)*, 756 F.2d 1043 (4th Cir.1985); *Control Data Corporation v. Zelman (In re Minges)*, 602 F.2d 38 (2d Cir.1979). "Transposed to the bankrupt-

cy context, the rule as applied to a bankrupt's decision to reject an executory contract because of perceived business advantage requires that the decision be accepted by courts unless it is shown that the bankrupt's decision was one taken in bad faith or in gross abuse of the bankruptcy retained business discretion." *In re Richmond Metal Finishers, Inc.,* 756 F.2d at 1047.

Furthermore, "[i]t is enough if, as a matter of business judgment, rejection of the burdensome contract may benefit the estate." *In re Minges,* 602 F.2d at 43; *In re Chipwich, Inc.,* 54 B.R. 427, 431 (Bankr.S.D.N.Y. 1985). The *Minges* court went on to state:

> [W]ithout explicitly using the "business judgment" terminology a number of courts have employed the substance of that test in emphasizing potential greater profit for the debtor's estate in deciding whether to permit rejection of a particular contract [citations omitted]. We believe that such a flexible test for determining whether an executory contract may be rejected, however termed (and "business judgment" is as good a label as any), is most appropriate. For in bankruptcy proceedings, the trustee, and ultimately the court, must exercise their discretion fairly in the interest of all who have had the misfortune of dealing with the debtor.

*In re Minges,* 602 F.2d at 43.

In *Minges,* disagreement existed as to whether a benefit to secured creditors was enough to justify the rejection, or whether general creditors as a whole must benefit. In dealing with this issue, the court held "[T]he disagreement, however, is irrelevant if there was a sound basis for the finding of the bankruptcy judge, ... that the general creditors would benefit from the enhanced value of the premises." *Id.,* at 44. Ultimately, the court determined that the record was not sufficient to determine that general creditors would derive a benefit from the rejection and remanded the case for further proceedings on that issue.

Under 11 U.S.C. § 365(g) and § 365(g)(1), upon rejection of the contract, the contract is then treated as having been breached as of the date immediately before the date of the filing of the petition. The party who is damaged by the rejection is permitted to file a claim pursuant to 11 U.S.C. § 502(g).

In deciding a motion to assume or reject an executory contract, the bankruptcy court places itself in the position of the trustee or debtor-in-possession and determines whether assumption or rejection of the contract is a reasonable business decision. *In re Orion Pictures Corp.,* 4 F.3d 1095, 1099, *cert. dismissed,* —— U.S. ——, 114 S.Ct. 1418, 128 L.Ed.2d 88 (1994). In determining whether the debtor has employed reasonable business discretion, the court for the most part must only determine that the rejection will likely benefit the estate. *See, e.g., In re Bildisco,* 682 F.2d 72, 79 (3d Cir.1982), *aff'd sub nom. N.L.R.B. v. Bildisco & Bildisco,* 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984). However, other courts have considered a variety of factors in evaluating business judgement, including: (a) whether the contract burdens the estate financially, *In re Minges,* 602 F.2d 38 (2d Cir.1979); (b) whether rejection would result in a large claim against the estate, *In re Sun City Investments Inc.,* 89 B.R. 245 (Bankr.M.D.Fla.1988); (c) whether the debtor showed real economic benefit resulting from the rejection, *In re Matusalem,* 158 B.R. 514 (Bankr.S.D.Fla.1993); and (d) whether upon balancing the equities, rejection will do more harm to the other party to the contract than to the debtor if not rejected, *In re Midwest Polychem Ltd.,* 61 B.R. 559 (Bankr.N.D.Ill.1986); *In re Monarch Tool & Mfg. Co.,* 114 B.R. 134 (Bankr. S.D.Ohio 1990).

## DISCUSSION

The sale of a Chapter 11 debtor's business, without the debtor's liabilities, is not uncommon. Such sales usually close after the debtor has successfully rejected contracts deemed undesirable by the purchaser. What makes this transaction unusual is that the time pressure resulting from Wal–Mart's ultimatum compelled Gitano and Fruit Of The Loom to close their transaction between the time the undesirable contracts had been designated for rejection and the motions to reject were made.

There appears to be no case law dealing with such a situation. The only case I found with somewhat similar facts is *In re Docktor Pet Centers, Inc.*, 1992 WL 189634, 1992 Bankr. Lexis 1151 (Bankr.D.Mass.1992), N.O.R., which assumed that the debtor could do what Gitano attempts to do here, with no discussion of the issue.

Before me, I have a debtor who, when faced with the choice of losing its largest customer, Wal–Mart, or selling the business, chose the latter and commenced the process of finding a purchaser for the company. Time was certainly of the essence because the time by which orders for the fall and Christmas seasons needed to be placed was near. Ultimately, Fruit Of The Loom agreed to purchase the company for $100 million. Since time was of the essence, the Sale Agreement provided that Fruit Of The Loom would have the right to designate additional contracts, prior to court approval of the Sale Agreement, it wished the debtor to reject thereafter. The provision which allowed Fruit Of The Loom to designate those contracts was included so that the Sale Agreement could be approved quickly and Fruit Of The Loom could meet Wal–Mart's deadline.

I see no reason to distinguish between a rejection motion returnable prior to the sale and one returnable after, if the rejection passes the business judgment test and the contracts to be rejected are designated prior to court approval of the sale contract. Forsyth argues that rejection of the agreement was not an exercise of Gitano's business judgment because Gitano will not receive a price better than the $100 million it has already received from Fruit Of The Loom and, therefore, the estate will not benefit. That is a myopic view of these facts.

Forsyth first urges Gitano, after pocketing the $100 million, to breach its contract with Fruit Of The Loom by refusing to reject the License. Because Gitano declined to do this dishonorable deed, Forsyth now asks the court to place itself in the debtor's position to do what Gitano would not. *See, In re Orion Pictures Corp.*, 4 F.3d 1095, 1099, *cert. dismissed*, — U.S. —, 114 S.Ct. 1418, 128 L.Ed.2d 88 (1994). That request is an inappropriate prayer to a court of equity. *See,*

*In re Bildisco*, 682 F.2d 72, 79 (3d Cir.1982), *aff'd sub nom. N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984).

A debtor may reject a contract to make itself more attractive to a buyer. *In re Maxwell Newspapers, Inc.*, 981 F.2d 85 (2d Cir.1992). I find that the ability to designate which contracts it wished to have rejected was a valuable right, for which Fruit Of The Loom bargained. I find further that the right to reject unfavorable contracts increased the value of the Gitano assets sold to Fruit Of The Loom to the benefit of Gitano's creditors, and Gitano's decision to sell that right was a proper exercise of its business judgment. *See, In re Minges*, 602 F.2d 38 (2d Cir.1979).

If Gitano had moved to reject the License before the sale, based on the business judgment test, I would have approved the rejection. *In re Maxwell Newspapers, Inc.*, 981 F.2d 85 (2d Cir.1992). Gitano's right to reject contracts improved the value of its assets. It was the improved assets for which Fruit Of The Loom paid $100 million.

## DECISION

Accordingly, Gitano's motion is granted. Settle Order.