### In re AMES DEPARTMENT STORES, INC., et al., Debtors.

### No. 01–42217 (REG).

United States Bankruptcy Court, S.D. New York.

Dec. 31, 2002.

---

Weil, Gotshal & Manges, LLP, New York City, by Martin J. Bienenstock, Esq., Michele J. Meises, Esq., and Samuel S. Kohn, Esq., of counsel, for the Debtors and Debtors in Possession.

Otterbourg, Steindler, Houston & Rosen, P.C., New York City, by Scott Hazen, Esq., Roseanne Finkel, Esq., for the Official Committee of Unsecured Creditors.

Morgan Lewis & Bockius, LLP, New York City, by Neil Herman, Esq., for Kimco Funding LLC.

Gross and Ruderman, White Plains, NY, by Mark Gross, Esq., for Northgate Shopping Center Limited Partnership.

Menter, Rudin & Trivelpiece, P.C., Syracuse, NY, by Kevin M. Newman, Esq., for New Paltz Properties, LP and Granite National Realty LLC.

White & Case, LLP, New York City, by Glenn M. Kurtz, Esq., and Wachovia Financial Center, Miami, FL, by Frank L. Eaton, Esq., for The Stop & Shop Supermarket Company.

Dollinger & Dollinger, Paramus, NJ, by Merrill O'Brien, Esq., for Hyde Park Mall.

Gordon, Feinblatt, Rothman, Hoffberger & Hollander, LLC, Baltimore, MD, by Bradley J. Swallow, Esq., for Harbor Holdings Limited.

Martin L. Brothers, Esq., New York City, by Martin L. Brothers, Esq., for Gandol Realty Company.

Klestadt & Winters, LLP, New York City, by Tracy L. Klestadt, Esq., John E.

Jureller, Jr., Esq., for Chase Green Mountain LP.

Posternak, Blankstern & Luno, L.L.P., Boston, MA, by Robert O. Resnick, Esq., for Coliseum Vikerry Realty Company Trust.

Piper Rudnick LLP, Baltimore, MD, by Mark J. Friedman, Esq., for Eden Center.

Kelley Drye & Warren LLP, Berenson Associates, The Druker Company, and Benderson Development Co., Inc., New York City, by Edward J. Leen, Esq., Attorneys for Manley.

Ross & Hardies, Chicago, IL, by Richard Mason, Esq., for Heritage Property Investment Trust, Inc.

### DECISION ON DEBTORS' ABILITY TO SELL DESIGNATION RIGHTS [1]

ROBERT E. GERBER, Bankruptcy Judge.

In this contested matter in a case under chapter 11 of the Bankruptcy "Code" (the Code), Ames Department Stores, Inc. and its subsidiaries (together, the "Debtors" or "Ames")—retailers whose operations ultimately were unsuccessful and which now are in the process of liquidation—seek approval of one of a series of motions for the sale of "designation rights" [2] with respect to the Debtors' right to assign leases in premises in which the Debtors had conducted their operations. In connection with this particular motion ("the Motion")—which, like the others, has had the strong support of the Creditors' Committee—the Debtors propose to sell the designation rights to Stop & Shop Supermarket Company ("Stop & Shop"), which has proposed to pay $20 million for them. An earlier motion of this character (for a similar sale of designation rights to Shaws Supermarkets, Inc.) was approved by this Court without material opposition, and others are to be expected.

The Motion has triggered a large number of objections, "limited objections," and reservations of rights by the lessors who are the counterparties to the leases in question. Most relate to issues under section 365 of the Code, which are not yet before the Court, and are easily capable of resolution or are premature, but a number of lessors oppose the Motion based on the assertion that the Bankruptcy Code does not allow debtors to sell designation rights at all. The objectors argue variously that designation rights are not property of the estate within the meaning of section 541 and hence cannot be sold; that the Debtors seek to transfer rights that were created under the Bankruptcy Code exclusively for use by a trustee or debtor in possession for the benefit of an estate; and that the process contemplates the future assumption and/or assignment of leases by a person or entity that is neither trustee nor debtor in possession. The Court directed

---

**1.** This written decision more extensively, and precisely, articulates the bases for the ruling announced on the record in open court at the conclusion of the hearing on this matter on December 17, 2002.

**2.** Designation Rights have been described as "the right to direct the Debtors to assume and assign ... Unexpired Leases ... to third parties qualifying under the Bankruptcy Code, after such non-end users locate ultimate purchasers of the Unexpired Leases...." (Objection of Harbor Holdings Limited to Debtors' Proposed Sale of "Designation Rights" ¶ 4 n. 2) (ECF # 1540) ("Harbor Holdings Obj.") (citing Motion of Debtors for Approval of Disposition Procedures ¶ 9) (ECF # 1419) (Debtors' Disposition Procedures Mot.). This is a useful shorthand means of describing the matter, though the Court believes that it is useful more fully to describe what the sale of Designation Rights does and does not do, and such description appears below, both in the Background and Discussion that follows.

the coordinated briefing by those making objections of this character (the "Objecting Lessors"), on the particular Motion here or similar ones, and has taken coordinated argument by objectors raising those issues.

For the reasons that follow, the Court determines that subject to the usual notice, business judgment and other garden-variety requirements for approval of a sale under section 363, the sale of designation rights is fully permissible in bankruptcy cases, and that there is nothing in either bankruptcy or non-bankruptcy law that prohibits this plainly salutary means for making available for the benefit of creditors the underlying economic value in a debtor's leases. While the Court notes that a sale of designation rights with respect to leases cannot and does not result in an exemption from the requirements of section 365 (including, *inter alia*, the showings that need to be made in connection with extensions of the time to assume or reject under section 365(d)(4), or incident to any ultimate assumption and assignment of a given lease)—as to which the rights of lessors necessarily must be honored—those matters can be addressed separately, in connection with associated requests for section 365(d)(4) extensions, and at such time as the assignment (and, if

applicable, assumption) of a particular lease is proposed.

### Background

The facts underlying the Motion and similar motions are undisputed. The Debtors' efforts to continue as a going concern in chapter 11 were unsuccessful, and the Debtors now are liquidating under the same chapter. The Debtors have ceased operations in the stores that they had not previously closed.

After the completion of going-out-of-business sales, the Debtors' principal remaining assets are their interests in real property—a small number of fee interests in real property,[3] and a much larger number of nonresidential real estate leases.[4] The Debtors' interest in many of their leases has an inherent economic value—most commonly because those leases provide for below-market rental rates, though occasionally by reason of the uniqueness of a particular parcel. For that reason, buyers and potential buyers (including some landlords themselves) have offered substantial sums to the estate, which would enure to the benefit of the Debtors' creditors, for individual leases and groups of leases, or for the means to control their disposition and extract potential profit therefrom.[5]

3. The Debtors own in fee two distribution centers, seven retail stores, the Ames corporate headquarters, and ten additional parcels of inconsequential value. The Debtors' sale of fee property is not a matter of concern on the part of the Objecting Lessors, and in the interests of clarity and conciseness will be disregarded in the remainder of this Decision

4. When they first filed their chapter 11 case, the Debtors were parties to more than 535 leases, of which 477 of them related to the retail stores the Debtors had operated. (Debtors' Designation Procedures Mot. ¶ 3). Under the Court's Case Management Order # 1, entered October 18, 2002 (ECF # 1258) (whose purpose, *inter alia*, was to clarify, for the

benefit of litigants, when they would need to prepare and produce witnesses, and minimize litigation costs when there were no disputed issues of fact, *see* Fed. R. Bankr.P. 9014(e)), undisputed allegations have been taken as true.

5. For that reason too, the Debtors were able to borrow on the strength of the economic value underlying the leases, along with the value of their fee interests. The Debtors' application for post-petition borrowing from Kimco Funding LLC, secured largely by the economic value of the Debtors' leases (or, more precisely, the proceeds the Debtors could obtain by reason of one more transactions for the sale and assumption and/or as-

The Debtors have begun the process of trying to realize on the economic value in their leases in an effort to maximize their distribution to creditors. With the assistance of professional advisors and experts, and the participation of the Creditors' Committee, the Debtors explored a variety of means to maximize the value they could obtain from the leases—by sale and assignment of individual leases; by bulk sale and assignment of many leases as part of a "package"; by the sale of designation rights, like the sale that is the subject of the Motion; or some combination of the above.

The sale of designation rights empowers the purchaser to direct the Debtors to convey (and, where applicable, assume and/or assign) the Debtors' interest in the real property that is the subject of the designation rights that have been sold. Where, as is usually the case, the real property in question is a debtor's interest as lessee, and a disposition requires the assignment of the particular lease (and, if not previously accomplished, the assumption of the lease), any such assumption and/or assignment, at whatever time it takes place, is effected by the *debtor*, and, of course, subject to the requirements of section 365 of the Code—which imposes a number of requirements for lessor protection, particularly if the lease in question is with respect to premises in a shopping center, as many, if not most, of the Debtors' leases are.

After extensive marketing efforts for the Leases, the Debtors received an initial expression of interest from Stop & Shop for the purchase of designation rights for a subset of the larger number of leasehold interests owned by the Debtors. This led to negotiations resulting in an agreement (the "Stop & Shop Agreement"), subject to this Court's approval, between Stop & Shop and the Debtors to sell the designation rights with respect to 18 stores for a purchase price of $20 million. Significantly from a section 363 "business judgment" perspective (as it dramatically reduces the economic burdens on the estate and risks that leases might not find a buyer), the Stop & Shop Agreement also contains a provision under which, beginning December 1, 2002, Stop & Shop will carry the Debtors' obligation for all of the ongoing occupancy costs (the "Carrying Costs") of the 18 leases under the Shop & Stop Agreement until the leases are assumed or rejected. The Debtors' estimate that this provision would save the estate in excess of $350,000 per month was not disputed. The Stop & Shop Agreement also provides that if Stop & Shop ultimately elects not to seek the assumption and assignment of any lease, Stop & Shop's interest in the lease would revert to the Debtors.

*Discussion*

■ It is undisputed that the sale of designation rights as sought under the Motion would make a great deal of business sense for the Debtors' creditors generally, and, if permissible, would easily pass muster under all of the traditional factors that a court looks to under any motion for approval of a transaction under section 363(b).[6] The Objecting Lessors contend, however, that it is not permissible.

Before the hearing, the Court asked the parties to brief the extent to which section 363(b) concerns could be invoked by counter-parties to executory contracts, whose interests would be diametrically opposite from those of the bulk of the creditor body (who would wish to maximize value), and

---

signment of the Debtors' leasehold interests) was approved by the Court on October 23, 2002 (ECF # 1283).

**6.** The Court's analysis in this regard was set forth on the record at the conclusion of the hearing. It was hardly noteworthy, and it is not repeated here.

In this connection, however, the Court is not writing on a clean slate. As the proponents of the Motion—the Debtors, the Creditors' Committee, and DIP financing lender Kimco—note, the sale of designation rights is hardly novel; it has been repeatedly approved, in at least 15 instances,[7] and in the only two reported decisions that have addressed the matter. *See In re Ernst Home Ctr., Inc.*, 209 B.R. 974 (Bankr.W.D.Wash.1997) (Overstreet, J.) (*"Ernst"*), *appeal dismissed, BC Brickyard Assoc., Ltd. v. Ernst Home Ctr., Inc. (In re Ernst Home Ctr., Inc.)*, 221 B.R. 243 (9th Cir. BAP 1998) (*"Ernst–B.A.P."*); *Ernst–B.A.P.*, 221 B.R. at 248–56 (Russell, J. concurring) (*"Ernst Russell Concurring Opinion"*). Importantly, no court, insofar as the numerous briefs on this issue reveal, has ever subscribed to the Objecting Lessors' position.

The Objecting Lessors, noting that the analysis in *Ernst* and in the *Ernst Russell Concurring Opinion* is not binding on this Court, argue that those decisions are incorrect, and ask this Court to disregard them and take a fresh look at the matter. While the Court is willing to take the fresh look, it declines to disregard *Ernst* and the Ernst Russell Concurring Opinion, and indeed holds just as they do. While it is true, of course, that those decisions are not binding on this Court, the Court nevertheless finds the analysis in those decisions persuasive, and, indeed compelling, for reasons set out at some length below.

Decisions as to designation rights present two general issues, though the first breaks down into a number of sub-issues. First, this Court addresses whether designation rights are property that can be sold by an estate in a case under the Bankruptcy Code.[8] Second, the Court must deter-

who would wish to advance their own private needs and concerns—concerns that a proposed transaction is in essence "too good" for the estate. Ultimately, the Court did not regard this as a dispositive issue. Though the Court continues to have doubts as to the matter, it assumed, without deciding, that the Objecting Lessors could raise these issues.

7. Counsel for Kimco submitted to the Court, with copies for all concerned, no less than 15 orders of courts around the country approving sales of designation rights. This Court's case management orders impose requirements on those submitting orders (in contrast to decisions) in other cases as authority. Before the hearing, the Court reminded counsel that if it were to be asked to take into account the entry of orders in other cases as precedent, the Court would also need to consider supplemental information to help it gauge the orders' persuasive value, including such things as the extent to which the requested order was opposed and the extent to which the court in question was called upon to focus on the disputed matter. (*See* Case Management Order # 1 ¶ 20) (ECF # 1258) (identifying information that must be provided in connection with the citation of orders). Kimco provided this information as well.

After hearing argument as to the persuasive value, if any, of those 15 orders—including, significantly, the point that nobody contends that there ever has been a decision or order *ever disapproving* the sale of designation rights—this Court believes that the sheer number of orders approving the sale of designation rights cannot be ignored. While it is clear to the Court that the transactions that were the subject of those orders involved varying degrees of controversy (with some orders having been entered over opposition and some without objection, and with varying degrees of judicial consideration of the issues here presented), this Court does not believe that any would have been entered by a court that believed that the sale of designation rights is impermissible. Thus the Court finds the 15 orders to have some persuasive value—though plainly not to the extent of the reported judicial decisions.

8. Though the Court does not need to decide the matter in light of the discussion that follows, the Court notes its considerable uncertainty as to whether the Court must address this issue and find, incident to permitting the desired sale, that the designation rights are property of the estate at all. Section 363(b)

mine whether there is anything improper in the manner by which designation rights transactions typically are structured, as they were here, where the debtor will later take actions under section 365, acting at the direction of a designation rights purchaser.[9]

The Objecting Lessors' points are addressed in turn.

## I

### Designation Rights as Property

Under section 363(b) of the Code, "the trustee,[ [10]] after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." (footnote added). In that context, the Objecting Lessors contend, as noted above, that designation rights are not property of the estate within the meaning of section 541 and thus cannot be sold.[11]

In addressing this contention it is appropriate to consider the statutory language of the Code, the caselaw, and the nature of the rights from which the estate is trying to derive value. Because the application of the statutory language and caselaw turns in material part on the rights themselves,

the Court turns to the nature of the rights first.

### A.

### Nature of the Rights

It is very common for the lessee's interest in a lease to have economic value, most commonly because market rental rates have risen since the time the rental rate in the lease was fixed, and the rent reserved under the lease for its remaining term has fallen to below-market. In a non-bankruptcy context, lessees can recover on that value—though leases not infrequently provide for limitations on that—either by provisions prohibiting assignment (or requiring lessor consent to it), or providing for a sharing with the lessor of the consideration for the assignment. In the bankruptcy context, Congress has provided that the value in a debtor's unexpired leases should enure for the benefit of all of a debtor's creditors, and has provided that subject to the procedural safeguards of the Code (principally in section 365), debtors may assume and assign their interests in leases even without lessor consent, and that notwithstanding any provisions in leases that prohibit, restrict, or condition the assignment of those leases, they may

---

protects creditors (e.g. by giving them a chance to be heard in connection with dispositions of estate property that might fail to secure the property's fair value), but creditors would be damaged by an ill-advised action in this regard only if whatever is disposed of is, in fact, estate property; the rights of others (such as counterparties to executory contracts) find their protection under non-bankruptcy law and other sections of the Code, such as section 365. If the estate can somehow secure value for the benefit of creditors by a transaction that does not involve a sale of estate property, the Court wonders whether section 363 need even be considered.

9. This means of articulating the issues represents a refinement of the way by which the issues were articulated when this Court an-

nounced its ruling at the conclusion of the hearing, when issues broken down in this decision were compressed somewhat, and the Court then addressed matters of business judgment, which, as noted, were so straightforward as to be unnecessary for discussion here.

10. Subject to exceptions and potential limitations not applicable here, a debtor in possession in a chapter 11 case has the rights and powers, and performs the functions and duties, of a trustee. *See* Bankruptcy Code section 1107(a). Thus the use of the word "trustee" in section 363(b) also includes a debtor in possession, such as each of the Debtors here.

11. (*See, e.g.,* Harbor Holdings Obj. at 5).

nevertheless be assigned.[12] Using that power conferred under section 365 to assign leases even without lessor consent, debtor lessees can sell the lessee's interests in such leases to those willing to pay for them—converting, for their creditors, into the much more liquid asset of cash, the economic value in the leases.

The "property" that the debtor is selling is such in several respects, or for several reasons. The first is that the property consists of the inherent economic value in its leases, which, so long as the rights to assignment or assignment proceeds are not curtailed by contract or applicable law, can be secured upon a sale and assignment of the leases in question even outside of bankruptcy. The second is that the property represents the proceeds from the Debtors' leasehold interests—i.e., the proceeds of recognized property of the estate, in the context of a mass of caselaw [13] (consistent with the legislative history of the Code [14]) holding that leasehold interests are themselves property. The third— though the appropriate characterization of this is more debatable (and though this may be regarded merely as the *means* for realizing on the underlying economic value,

and/or for collecting lease proceeds)—is that the debtor has been conferred the right by the Bankruptcy Code, under section 365, to compel the lessor's acceptance of an assignment of the lease (subject, once more, to the statutory safeguards), and thereby to ensure that the lease can be sold whenever there is a buyer willing to pay for it.

The foregoing may be regarded as variants of the same property right, or as representing more than one. But any distinction in that regard is immaterial—as the Court has no doubt that the bundle of these interests and rights is property as a basic economic matter,[15] unless there is something in the Bankruptcy Code or caselaw that negates that conclusion.

Judge Overstreet recognized the basic economic point in her decision in *Ernst.* In ruling that designation rights were property of the estate that the debtor Ernst could assign, she noted that the transaction represented, in effect, a sale of the "bonus value" of the leases—"that value that may be present in the . . . [l]eases because they are long-term leases with rents below the current market value of the leased space." 209 B.R. at 985.[16]

---

**12.** *See* Bankruptcy Code section 365(f).

**13.** *See, e.g., 48th St. Steakhouse, Inc. v. Rockefeller Group, Inc. (In re 48th St. Steakhouse, Inc.),* 835 F.2d 427, 430 (2d Cir.1987) ("The courts are in agreement that unexpired leasehold interests . . . constitute property of the bankrupt estate"), *cert. denied,* 485 U.S. 1035, 108 S.Ct. 1596, 99 L.Ed.2d 910 (1988).

**14.** The legislative history expressly noted that a leasehold interest would be one example of a debtor's interest in property. *See* H.R.Rep. No. 595, 95th Cong. 1st Sess. 367 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6323.

**15.** One way of looking at the matter is to ask a rhetorical question: how could it be that something for which a buyer is willing to pay $20 million (and others have paid, in the

aggregate, billions, *see* Creditors' Committee Resp. ¶ 6 (ECF # 1557)) does not rise to the level of property? It plainly is property, in an economic and "real world" sense.

**16.** In a different context—in considering the factors set forth in *Theatre Holding Corp. v. Mauro,* 681 F.2d 102 (2d Cir.1982), and its progeny, for determinations as to extensions of the section 365(d)(4) period to assume or reject, which included whether the "lease is the primary asset of the debtor"—Judge Overstreet had previously noted that each of the leases was "clearly a principal asset of the debtor; that together," they were *"the* primary assets of Ernst;" and that "[t]he $12 million guaranteed purchase price to by paid by [the buyer] is proof of the importance and value of these assets." *Ernst,* 209 B.R. at 981 (emphasis in original).

Similarly, though not in a bankruptcy context, the Supreme Court has recognized the basic economic point, and ruled as a consequence that a tenant's interest in the economic value of a lease is property capable of being protected under the Fifth Amendment to the Constitution. *See Alamo Land & Cattle Co. v. Arizona,* 424 U.S. 295, 303, 96 S.Ct. 910, 47 L.Ed.2d 1 (1976). The Supreme Court there held:

Ordinarily, a leasehold interest has a compensable value whenever the capitalized then fair rental value for the remaining term of the lease, plus the value of any renewal right, exceeds the capitalized value of the rental the lease specifies.

424 U.S. at 304, 96 S.Ct. 910. The Supreme Court went on to articulate the underlying economic principles:

A difference between the rental specified in the lease and the fair rental value plus the renewal right could arise either because the lease rentals were set initially at less than fair rental value, or because during the term of the lease the value of the land, and consequently its fair rental value, increased. . . . [T]he fair rental value of the land may increase during the term of the lease. If this takes place, the increase in fair rental value operates to create a compensable value in the leasehold interest.

*Id.* at 304–305, 96 S.Ct. 910 (footnote omitted).

*Alamo Land & Cattle* compels the conclusion that these judicially recognized valuable rights are property unless there is something in the Code or caselaw compelling a different result.[17]

### B.

### Code and Caselaw

Turning then to the words of the Code, and the caselaw construing it, the Court naturally looks to the Code's definition of property of the estate, and judicial interpretations of that language. With exceptions set forth in sections 541(b) and 541(c)(2) that are not asserted to be applicable here, Bankruptcy Code section 541, captioned "Property of the estate," provides, in relevant part:

(a) The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:

(1) Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case.

. . .

(6) Proceeds, product, offspring, rents, or profits of or from property of the estate, except such as are earnings from services performed by an individual debtor after the commencement of the case.

**17.** The Court is well aware that the Supreme Court had earlier held in *Segal v. Rochelle,* 382 U.S. 375, 86 S.Ct. 511, 15 L.Ed.2d 428 (1966), that "[w]hether an item is classed as 'property' by the Fifth Amendment's Just–Compensation Clause or for purposes of a state taxing statute cannot decide hard cases under the Bankruptcy Act, whose own purposes must ultimately govern." *Id.* at 379, 86 S.Ct. 511. For that reason, the Court does not view the holding in *Alamo Land & Cattle* as the end of the discussion. But the Court nevertheless regards *Alamo Land & Cattle* as an important starting point, significant for its economic analysis and because *Segal v. Rochelle* itself, and the Second Circuit's decision in *Prudential Lines* (both discussed below; both of which do consider bankruptcy law needs and concerns; and both of which, of course, are binding authority on this Court) emphasize how broadly "property" must be construed in the context of the purposes of bankruptcy law.

(7) Any interest in property that the estate acquires after the commencement of the case.

In this Court's view, section 541(a)(1) applies to the underlying economic rights; section 541(a)(6) applies to those rights as well, as proceeds of estate property; and each of sections 541(a)(1), 541(a)(6) and 541(a)(7) applies to the estate's ability to secure the value of such rights—even if such can be achieved only post-petition, and with the assistance of other sections of the Code.

### 1. Inherent Economic Value or "Bonus Value"

"Property of the estate" is defined under section 541(a)(1) as "all legal or equitable interests of the debtor in property as of the commencement of the case." The Supreme Court has recognized that Congress intended property of the estate to be broadly defined. *See United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204–205, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983) (the "House and Senate Reports on the Bankruptcy Code indicate that § 541(a)(1)'s scope is broad"). The Second Circuit has noted that Congress wished to "bring anything of value that the debtors have into the estate." [18] *Official Comm. of Unsecured Creditors v. PSS S.S. Co. (In re Prudential Lines Inc.)*, 928 F.2d 565, 573 (2d Cir.1991) ("*Prudential Lines*"). The Second Circuit has similarly stated, very recently, that "property of the estate" is broad, and includes even strictly contingent interests. *See Mid–Island Hosp., Inc. v. Empire Blue Cross and Blue Shield (In re Mid–Island Hosp., Inc.)*, 276 F.3d 123, 128 (2d Cir.), *cert. denied,* — U.S. ——, 123 S.Ct. 104, 154 L.Ed.2d 140 (2002). In a recent decision (in a different case and a different context, before this issue came up here), this Court noted that "the legislative history makes it plain that section 541's scope is broad, including all kinds of property," including tangible or intangible property. *Adelphia Communications Corp. v. Associated Electric & Gas Ins. Serv., Ltd., (In re Adelphia Communications Corp.)*, 285 B.R. 580, 590 (Bankr. S.D.N.Y.2002) (Gerber, J.).

■ Though the Court is doubtful that the result would be different in any other circuit, it is bound by the Second Circuit's observation in *Prudential Lines,* in the context of consideration of section 541, that Congress wished to "bring *anything* of value that the debtors have into the estate," 928 F.2d at 573 (emphasis added), and *Prudential Lines* compels a conclusion that the economic value in the Debtors' leases is property within the meaning of section 541(a)(1). There the Second Circuit held that NOL carry-forwards were property of the Prudential Lines estate, answering a question left open in *Segal v. Rochelle. See* 928 F.2d at 571. The Second Circuit noted that the legislative history of the Code "demonstrates that Con-

---

**18.** Similarly, the Supreme Court held in *Segal v. Rochelle,* a pre-Code decision, that NOL carry-backs were property of the estate, in the context of entitlements to a tax refund. Considering a conflict between circuits, it rejected decisions by the First and Third Circuits reasoning that prior to the year's end, a loss carry-back refund claims was too tenuous to be classified as property under the Bankruptcy Act. *Segal v. Rochelle,* 382 U.S. 375, 377–79, 86 S.Ct. 511, 15 L.Ed.2d 428 (1966). Speaking through Justice Harlan, it held that

"the main thrust" of the predecessor provision in the Bankruptcy Act that addressed what would be property of the estate was "to secure for creditors everything of value the bankrupt may possess in alienable or leviable form. . . ." And it continued:

[T]he term "property" has been construed most generously and an interest is not outside its reach because it is novel or contingent or because enjoyment must be postponed.

*Id.* at 379, 86 S.Ct. 511.

gress agreed with the result reached by the *Segal* Court," *id.* at 571, and noted that "interests whose value is speculative and interests that involve intangible rights that are subject to regulation may be included as property of the estate." *Id.* at 572.

Consistent with that is the holding by Judge Kaplan in this Court's sister court that the concept of property is general enough to embrace anything that has exchangeable value. *Slater v. Smith (In re Albion Disposal, Inc.),* 152 B.R. 794, 807 (Bankr.W.D.N.Y.1993) (Kaplan, C.J.) (citing *Associated Press v. Int'l News Serv.,* 245 F. 244 (2d Cir.1917)) (*"Albion Disposal"*). Judge Kaplan went on to observe— albeit in a different context (that of efforts to recover property of the estate)—that "[a]ny right that is not unlawful or against public policy, which has acquired a pecuniary value, becomes a property right entitled to protection." *Id.* at 807. This Court rules, accordingly (though it believes that it is merely applying the existing law), that the underlying economic value in the Debtors' leases—whether characterized as such or by the useful shorthand, "bonus value"—is plainly property of the estate within the meaning of section 541(a)(1).

### 2. Property Which is the Proceeds of Estate Property, Under Section 541(a)(6)

As previously noted, under section 541(a)(6) of the Bankruptcy Code, property of the estate also includes the proceeds or profits of such property. That matter, which was not meaningfully addressed by the Objecting Lessors, is of considerable significance here. It is undisputed that the lessee's interest in the leases is property of the Debtors' estates, and the amounts that can be received from a sale of that interest, assuming such can be done, plainly are the proceeds of the underlying leases.[19] That was recognized by each of Judge Overstreet and Judge Russell in their respective decisions in *Ernst* and in the *Ernst Russell Concurring Opinion,* and their analysis in this respect plainly was correct.

As Judge Overstreet put it:

In the most simple analysis, the "bonus value" of a lease is nothing more than an estimate of the value of a lease that will be realized in the form of cash proceeds when the lease is actually assigned. No one would dispute that the lease itself is property and, under Section 541(a)(6), proceeds of property are expressly included in the ambit of property of the estate. Under the [designation rights agreement], the parties have fixed the value of the [leases in question] as the purchase price to be paid by [the designation rights buyer], and that value may be realized by [the buyer] upon Ernst's assumption and assignment of the leases when the proceeds are actually received. Those proceeds constitute property.

209 B.R. at 985.

Similarly, Judge Russell noted in the *Ernst Russell Concurring Opinion:*

The bankruptcy court did not err when it determined that the bonus value of the debtor's real property leases constituted property of the estate. The bonus value, which *is a proceed from a lease contract,* is clearly property of the estate.

221 B.R. at 250 (emphasis added).

### 3. Property As a Consequence of Rights Arising Under the Bankruptcy Code

The Objecting Lessors properly agree that what is property in bankruptcy cases

---

**19.** Alternatively, they might be regarded as the "profits." That is a distinction without any substantive significance. Property of the estate (i.e., the leases) has given rise to cash that can be used for the benefit of creditors.

is governed by applicable non-bankruptcy law [20]—usually state law,[21] but sometimes federal law.[22] And they seemingly do not quarrel with the observation of the Supreme Court in *Whiting Pools* that section "541(a)(1) is intended to include in the estate any property made available to the estate by other provisions of the Bankruptcy Code." 462 U.S. at 205, 103 S.Ct. 2309. But they nevertheless argue that what is being sold is not property of the debtor "as of the commencement of" the bankruptcy case under section 541(a)(1), as they contend that it is "the power to assume or reject unexpired real property leases," which comes into existence "solely as a result of the filing of a bankruptcy case." [23]

The Court believes that the contention is factually unsupported and erroneous as a matter of law, for at least three reasons in the aggregate. First, the Court disagrees with the express premise that the Debtors are selling a federal power—i.e., the right to assume and/or assign their leases—and the implied premise that they are selling *only* a federal power. As the transaction has been structured, the *Debtors* retain the power—the sole power—to assume and assign their leases, and (aside from selling the underlying economic value) are selling only the right to direct the estate with respect to that power's exercise. That raises fiduciary duty issues, discussed below, but it does not go to whether *what* the Debtors are selling, for which buyers are prepared to pay millions of dollars, is property of their estates.

Second, the most important part of that which is being sold, as previously discussed, is the value in the leases. That value, of course did not come into existence solely as a result of the filing of the bankruptcy case. It existed without regard to the filing of the Debtors' bankruptcy case, and before the Debtors' bankruptcy cases were filed; the fact that it would be realized upon—i.e., converted into cash—only post-petition is of no moment.[24]

**20.** As the Second Circuit held in *Prudential Lines, see* 928 F.2d at 569, the nature and extent of the debtor's interest in property is determined by applicable non-bankruptcy law. "Whether that interest is included in the property of the debtor's estate is determined by bankruptcy law." *Id.*

**21.** Ordinarily, bankruptcy courts look to state law to determine whether a particular interest is "property" for purposes of bankruptcy and section 541. *Ernst*, 209 B.R. at 985. They do so under the Supreme Court's holding in *Butner v. United States*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979).

> Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding. Uniform treatment of property interests by both state and federal courts within a State serves to reduce uncertainty, to discourage forum shopping, and to prevent a party from receiv-

> ing "a windfall merely by reason of the happenstance of bankruptcy."
> *Id.* at 55, 99 S.Ct. 914 (quoting *Lewis v. Manufacturers National Bank*, 364 U.S. 603, 609, 81 S.Ct. 347, 5 L.Ed.2d 323 (1961)).

**22.** *See e.g., Prudential Lines*, 928 F.2d at 573 (holding that a debtor's right under federal law to offset its future federal tax liability attributable to a net operating loss (NOL) was property of the estate); *In re Magnesium Corp. of America*, 278 B.R. 698, 705 (Bankr. S.D.N.Y.2002) (Gerber, J.) ("It is true, at least in this Circuit, that federally created rights can be property of the estate").

**23.** (Harbor Holdings Obj. at ¶ 11).

**24.** In each of the cases involving NOL carrybacks and carry-forwards, the fruits of such had not been realized as of the time of the filing of the debtor's case under the Bankruptcy Code. *See Segal v. Rochelle*, 382 U.S. at 379, 86 S.Ct. 511 (with "property" having been construed "most generously," an interest is "not outside its reach because ... enjoy-

Third, the Code expressly lists, as estate property (subject to some inapplicable limitations), both proceeds of estate property, section 541(a)(6), and property acquired post-petition, section 541(a)(7).[25] Subject to statutory exceptions not applicable here, property that comes into the possession of the estate post-petition, either as proceeds or as a result of measures the Code provides to accumulate property for the benefit of creditors, is property under the plain meaning of those provisions.

However, the Objecting Lessors argue, based on one of the Third Circuit's rulings in connection with the *Cybergenics* case, *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.)*, 226 F.3d 237, 246 n. 16 (3rd Cir.2000) ("*Cybergenics I*"),[26] that a debtor's ability to realize on the economic value only *post-petition* takes the Debtors' rights out from the ambit of section 541(a)(1). They so argue based on language in *Cybergenics I* that "[s]ubject to a few specifically enumerated exceptions, the bankruptcy estate contains only the interests of the *debtor* in property as of the

time of the bankruptcy filing, 'no more, no less.' "[27] This Court is unpersuaded by that argument.

The quoted language in *Cybergenics I* was focusing not on the time by which any property interest needed to arise, but rather *who* was the owner of the property interest. There was a reason that the Third Circuit italicized "*debtor*;" the Third Circuit was contrasting "debtor" from "creditors," and contrasting the rights held by the debtor to those the court found had been vested in its creditors instead. The issue before the Third Circuit was whether the right to sue had been sold away when the assets of the debtor Cybergenics—as contrasted to the assets of Cybergenics, as debtor in possession (i.e., the estate)—had been sold. That issue has no relevance here.[28]

To be sure, language in *Cybergenics I's* footnote 16 continues in a manner that might suggest that for at least some purposes, courts might ultimately make a distinction between at least some kinds of "powers" (there, avoidance powers) and "property"[29]—though it did not express

---

ment must be postponed"); *Prudential Lines*, 928 F.2d at 572 ("the fact that the right to a NOL carryforward is intangible and has not yet been reduced to a tax refund also does not exclude it from the definition of property of the estate").

25. Harbor Holdings had addressed section 541(a)(1), but did not address, in this context, sections 541(a)(6) and 541(a)(7). (*See generally* Harbor Holdings Obj.).

26. This decision should not be confused with a second decision in the Cybergenics cases, *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 304 F.3d 316 (3d Cir.) ("*Cybergenics II*"), reh'g en banc granted and opinion vacated, 310 F.3d 785 (3d Cir. Nov.18, 2002), whose significance at one point was argued by certain Objecting Lessors, but upon which reliance was later withdrawn.

27. (Harbor Holdings Obj. ¶ 12) (emphasis in original) (quoting *Cybergenics I*, 226 F.3d 237, 246 n. 16).

28. Moreover, the language relied on was dictum. The *Cybergenics I* court noted, in the language leading into the footnote:

> Issues relating to property of the estate are simply not relevant to the inquiry into whether the fraudulent transfer claims in the Committee's complaint were assets of Cybergenics as debtor or debtor in possession.

The *Cybergenics I* court continued: "that issue is not before us in this case, and we must take care not to conflate these two distinct issues." 226 F.3d at 246 n. 16.

29. The Third Circuit stated, in that connection, quoting it in full:

> In addition, although at least one Bankruptcy Court—and the very judge who

that view definitively, saying only that the view that the avoidance power was *itself* property of the estate was "hardly a universally accepted view." *Id.* But assuming, arguendo, that the dictum in *Cybergenics I's* footnote 16 were to be carried over from powers to avoid transfers to powers to assign leases, that would mean no more than the power arising under section 365(f) to compel lessors to accept assignments is not, by itself, an *additional* basis for finding a property right, but should be regarded only as a means or mechanism for realizing on the underlying economic value in the lease, or securing that value as proceeds of the lease.

## II.

### Vesting Power in a Non–Fiduciary

█ Noting that under section 365 of the Code, debtors have "the right to assume and assign leases and to exercise business judgment related thereto,"[30] the Objecting Lessors next argue that the Debtors "effectively seek to transfer to non-fiduciaries the fundamental powers of a debtor in possession" under that section.[31]

But as previously noted, the Debtors are not doing that. They will continue to act in connection with any powers under section 365, and any and all actions to assume and/or assign will be taken by the Debtors. The Debtors are not transferring their section 365 powers. What enables the Objecting Lessors to contend that "effectively" the Debtors are doing something

wrong is a variation of that argument—a contention that to the extent powers will be exercised, after the sale of the designation rights, by a debtor in possession (in contrast to buyers of designation rights) upon the *direction* of the buyers of those rights, such would be an impermissible breach of the fiduciary duties of a debtor in possession in connection with the exercise of its rights and responsibilities when making decisions as to whether to assume or reject, and whether or not to assign.

But that confuses a matter of timing with one of substance. Timing (so long as appropriate consideration is given before the estate commits itself) is not a material matter of concern to the Court; substance is.

By entering into a transaction involving the sale of designation rights, the Debtors are of course committing themselves to a course of action, but one that does not differ materially in concept from any other post-petition transaction. As with any post-petition transaction, the Debtors must act consistently with their fiduciary duties, but the debtor responsibilities are the same, and the factors for the debtor, creditors and the Court to consider are the same, whether the sale is one of "designation rights," on the one hand, or the sale of one or more individual leases (with associated assignments of the lease), on the other. Sales of valuable property of the estate (e.g., the value in leaseholds), and decisions as to whether to assume, assume

---

presided over Cybergenics' bankruptcy case—has stated that the avoidance power provided by the Bankruptcy Code is, itself, property of the estate, *see In re Becker,* 136 B.R. 113, 116 (Bankr.D.N.J. 1992), this is hardly a universally accepted view. *See, e.g., In re Saunders,* 101 B.R. 303, 305 (Bankr.N.D.Fla.1989); 5 COLLIER ON BANKRUPTCY ¶ 541.14 n.

1 (Lawrence P. King, ed., 1999) (stating that avoiding powers are not property of the estate, but, rather, statutorily created powers to recover property). *Id.*

**30.** (Harbor Holdings Obj. ¶ 13).

**31.** *Id.*

and assign, or reject leases,[32] all involve exercises of fiduciary duty, but there is nothing in the Code that says *when* the Debtor must engage in the necessary analysis, so long as it has been done before the Debtor seeks to commit itself.

Instructive in this regard is the decision of the late Judge Gallet in this district, *In re G Survivor Corp.* 171 B.R. 755 (Bankr. S.D.N.Y.1994). There the entire Gitano sportswear business was sold, under circumstances where the transaction had to be accomplished quickly. *Id.* at 756. An agreement was entered into where Fruit of the Loom would purchase Gitano's assets, which further provided that certain of the debtor's executory contracts would be rejected by the debtor. *Id.* By reason of the press of time, however, not all of the executory contracts could be analyzed, and the agreement also provided that buyer Fruit of the Loom had the right to designate additional contracts to be rejected, in the buyer's discretion. *Id.* at 756. Judge Gallet upheld that arrangement, approving both the sale agreement and the rejection of a license agreement that had been so designated. *Id.* at 759. He approved the rejection even though the debtor's rejection decision was merely implementing the buyer's direction, in accordance with the deal that the debtor previously had made. *Id.*

Judge Gallet stated in that connection:

A debtor may reject a contract to make itself more attractive to a buyer. I find that the ability to designate which contracts it wished to have rejected was a valuable right, for which Fruit Of The Loom bargained. I find further that the right to reject unfavorable contracts increased the value of the Gitano assets sold to Fruit Of The Loom to the benefit of Gitano's creditors, and Gitano's decision to sell that right was a proper exercise of its business judgment.

If Gitano had moved to reject the License before the sale, based on the business judgment test, I would have approved the rejection. Gitano's right to reject contracts improved the value of its assets. It was the improved assets for which Fruit Of The Loom paid $100 million.

*Id.* (citations omitted).

Committing an estate to an immediate sale and immediate assignment of a lease, on the one hand, or to an immediate sale and possible future assignment, on the other, are differences only in the mechanics, and are simply examples of the nearly infinite ways by which a transaction can be structured if it otherwise makes business sense and involves a proper exercise of business judgment.[33] Subject to the usual requirements for a debtor's exercise of business judgment and notice and opportunity for parties in interest to be heard, bankruptcy courts can accommodate evolving ways to maximize value for creditors.[34]

32. Of course, where, as here, any assumption would be followed by an immediate assignment, and/or a creditworthy entity bears the debtors' costs in carrying their leases and deferring any decisions in this regard, the risks of debtors in these respects are dramatically reduced.

33. Of course, a debtor has post-petition rent obligations that will continue until the lease is actually assumed and assigned or rejected—obligations that do not go away by reason of the sale of designation rights—and the costs

of this would necessarily have to be a part of the equation in considering the wisdom of any transaction involving the sale of designation rights. Here any concerns in that connection were well addressed by another aspect of the transaction, making the designation rights buyer liable for the Carrying Costs.

34. Other aspects of designation rights transactions sometimes leading to controversy include provisions in proposed approval orders extending the time to assume or reject under section 365(d)(4), or invalidating "going

*Conclusion*

For the foregoing reasons, the Court concludes that the sale of designation rights is fully permissible under the Code.

dark" or use provisions as violative of section 365(f). Whether provisions of that character are appropriate, appropriate in concept but excessive in time or scope, or inappropriate will depend on the facts of the case, guided by caselaw that assists courts in making such determinations. *See, e.g., South St. Seaport LP v. Burger Boys, Inc. (In re Burger Boys),* 94 F.3d 755 (2d Cir.1996) (section 365(d)(4) extensions); *In re Rickel Home Ctrs., Inc.,* 240 B.R. 826 (D.Del.1998) (Farnan, J.), *appeal dismissed,* 209 F.3d 291 (3d Cir.2000) (going dark and use provisions). Decisions of that character are in essence section 365 determinations, as to which any lessor concerns can be heard, at whatever time they are ripe; the need to adjust any such provisions in approval orders to the facts of the case and facts involving any particular lessor(s) does not, however, go to whether sales of designation rights are permissible.